RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 11a0284p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

    *v.*

GEVOYL N. BEAUCHAMP,
              *Defendant-Appellant.*

No. 10-5102

Appeal from the United States District Court
for the Eastern District of Kentucky at Covington.
No. 08-00086-001—David L. Bunning, District Judge.

Argued: July 22, 2011

Decided and Filed: October 25, 2011

Before: MOORE and KETHLEDGE, Circuit Judges; MARBLEY, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Curtis Lee Blood, Collinsville, Illinois, for Appellant. Elaine K. Leonhard, ASSISTANT UNITED STATES ATTORNEY, Fort Mitchell, Kentucky, for Appellee. **ON BRIEF:** Curtis Lee Blood, Collinsville, Illinois, for Appellant. Elaine K. Leonhard, ASSISTANT UNITED STATES ATTORNEY, Fort Mitchell, Kentucky, Charles P. Wisdom Jr., ASSISTANT UNITED STATES ATTORNEY, Lexington, Kentucky, for Appellee.

      MARBLEY, D. J., delivered the opinion of the court, in which MOORE, J., joined. KETHLEDGE, J. (pp. 19–24), delivered a separate dissenting opinion.

_____

[*] The Honorable Algenon L. Marbley, United States District Judge for the Southern District of Ohio, sitting by designation.

_____

**OPINION**

_____

ALGENON L. MARBLEY, District Judge.    Defendant-appellant Gevoyl Beauchamp appeals the judgment entered following his plea of guilty to possession with intent to distribute crack cocaine.    Beauchamp challenges the district court's denial of a motion to suppress evidence obtained pursuant to a seizure.    Because the police officer's seizure of Beauchamp was neither consensual nor based on reasonable and articulable suspicion, and because the consent given to search was involuntary and did not purge the taint of the illegal seizure, we reverse the district court's order denying the motion to suppress and remand for further proceedings.

## I. BACKGROUND

### A. Factual Background

At approximately 2:30 a.m. on February 15, 2008, Officer Robert Fain was on patrol near the Jacob Price housing project in Covington, Kentucky.    At the time, the police were saturating the area because they were receiving a "ton" of narcotics complaints.    His partner, Officer Chris Dees, was patrolling separately and noticed a black man (later identified as Beauchamp) with another individual.    As Officer Dees approached, Beauchamp hurriedly walked away without making eye contact with the officer.    Officer Dees then told his partner to stop the "suspicious subject," but beyond the facts that Beauchamp was out in Jacob Price at 2:30 a..m., the basis for this label was never explained.[1]

While driving, Officer Fain spotted Beauchamp walking across the street two blocks from where Officer Dees had seen him.    Officer Fain sped up his patrol car and parked by the subject.    Beauchamp walked around a wrought iron fence that was by the

_____

[1]Officer Fain's statements about the motivation for the stop are unclear; he stated that "Officer Dees had gone direct with me to tell me what was going on, why he was having me stop him and what." Officer Dees, however, did not testify as to his rationale for identifying the subject as suspicious.

side of the road.  Officer Fain, in uniform, got out of his car and instructed Beauchamp to stop.  Beauchamp complied.  Officer Fain then instructed Beauchamp to walk around the fence and toward him.  Beauchamp again complied.  As he was walking around the fence, the officer noticed that "he seemed very nervous, visibly shaking," wide-eyed, and scared.  Beauchamp's pants kept falling down around the lower part of his thighs, and his legs were shaking.  Officer Fain asked him where he was coming from and where he was going.  Beauchamp gave somewhat vague answers in response, simply saying "down there." Another officer, Officer Cook, arrived at some point during the interview, and he stood by and watched.

After the questioning, Officer Fain frisked Beauchamp for weapons.  While conducting the frisk, the officer asked Beauchamp if he had anything on him that the officer should be aware of, and Beauchamp said no.  The officer did not find a weapon. Officer Fain then asked Beauchamp if he could conduct a search, and Beauchamp said yes.  The officer then conducted the search; Beauchamp continued to visibly shake.  The officer found $1,300 in cash and a cell phone.  Beauchamp's pants were around his thighs, so Officer Fain pulled out his boxers and saw a piece of plastic sticking up between his butt cheeks.  Officer Fain assumed that the plastic contained drugs, as people on the east side were carrying drugs in this manner at that time.

It is unclear if Officer Dees arrived on the scene during the search or after it was completed.[2]  Once there, he recognized Beauchamp from previous encounters.  At some point, either upon Officer Dees's arrival or after Officer Fain looked into Beauchamp's boxers, Officer Fain gave his partner a look to indicate that he had found something. Recognizing that the look meant "hey, we got something here," Officer Dees grabbed Beauchamp by his jeans.  Officer Fain then pulled Beauchamp's boxers back again and asked him what he had in his pants, between his butt cheeks, and Beauchamp attempted to run.  Both officers had their hands on him, so he never escaped their grasp.  The officers secured Beauchamp against the hood of a police cruiser.  Officer Fain continued

---

[2]Officer Fain testified that he had completed the search when Officer Dees arrived.  Officer Dees testified that he arrived while the search was ongoing and observed Officer Fain pull back Beauchamp's boxers.  The district court credited both officers and found that this testimony was not conflicting.

his search and removed the plastic from between Beauchamp's butt cheeks. It contained about 18 individually-wrapped rocks of crack cocaine.

## B. Procedural Background

Beauchamp was indicted on two counts: (1) possession with intent to distribute five grams or more of cocaine base (crack cocaine) in violation of 21 U.S.C. § 841(a)(1); and (2) distributing less than five grams of crack cocaine in violation of 21 U.S.C. § 841(a)(1). The district court dismissed Count 2. Beauchamp moved to suppress the evidence seized from him in the warrantless search. After a hearing, the magistrate judge issued a report and recommendation that the district court deny the motion. Beauchamp objected in writing. The district court overruled the objections and adopted the report and recommendation.

The parties entered into a plea agreement, which preserved Beauchamp's right to appeal the denial of the motion to suppress. The district court accepted the plea agreement and Beauchamp's plea of guilty to Count 1. Beauchamp's Guidelines range was 70 to 87 months. The district court sentenced him to 84 months.

## II. ANALYSIS

## A. Standard of Review

"When reviewing the denial of a motion to suppress, we review the district court's findings of fact for clear error and its conclusions of law *de novo*." *United States v. Henry*, 429 F.3d 603, 607 (6th Cir. 2005) (internal quotation marks omitted). In so doing, we consider the evidence in the light most favorable to the government. *United States v. Rodriguez-Suazo*, 346 F.3d 637, 643 (6th Cir. 2003).

"'While we review the determination of the ultimate question of whether there was consent *de novo*, we must afford due weight to the factual inferences and credibility determinations made by the district court.'" *United States v. Moon*, 513 F.3d 527, 536 (6th Cir. 2008) (quoting *United States v. Caruthers*, 458 F.3d 459, 464 (6th Cir. 2006)).

**B. The Seizure**

The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV.  There are three kinds of permissible encounters between the police and citizens: "(1) the consensual encounter, which may be initiated without any objective level of suspicion; (2) the investigative detention, which, if non-consensual must be supported by a reasonable, articulable suspicion of criminal activity; and (3) the arrest, valid only if supported by probable cause." *United States v. Smith*, 594 F.3d 530, 535 (6th Cir. 2010) (internal citations omitted).  While purely consensual encounters are not subject to Fourth Amendment scrutiny, *see Florida v. Bostick*, 501 U.S. 429, 434 (1991), all seizures—including brief investigatory stops—receive this protection, *see Smith*, 594 F.3d at 535.  Accordingly, the first issue before us is whether the initial interaction between Officer Fain and Beauchamp was a consensual encounter or a non-consensual seizure.

**1. Moment of Seizure**

An individual is seized when an officer "by means of physical force or show of authority, has in some way restrained [his] liberty." *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968); *see also Tennessee v. Garner*, 471 U.S. 1, 7 (1985) (stating that "[w]henever an officer restrains the freedom of a person to walk away, he has seized that person").  If the officer acts by a show of authority, as in this case, the individual must actually submit to that authority. *Brendlin v. California*, 551 U.S. 249, 254 (2007).  In order to determine if a seizure has occurred, we will look to "all of the circumstances surrounding the incident" and consider whether "a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980).

A reasonable person in Beauchamp's position would not have felt free to leave when, after walking away from the police two times, an officer targeted Beauchamp by driving up to him, instructed him to stop, and then instructed him to turn around and walk toward the officer.  Two features of the encounter compel this finding.  First, a

reasonable person in Beauchamp's position would perceive the separate interactions with Officer Dees and then Officer Fain as connected and an indication that the officers were targeting him. There certainly could be situations in which a reasonable person would not perceive police interactions as connected; perhaps if there was a longer period of time between interactions or if they occurred in different locations. In this case, however, Beauchamp encountered Officer Dees and walked away, and then two streets over and presumably only a few minutes later, given the short distance, Officer Fain drove up to Beauchamp. Even though Officer Dees did not say anything to Beauchamp, a reasonable person would not dismiss the initial encounter with Officer Dees as merely coincidental when a second officer, almost immediately thereafter, sped up his patrol car, parked by Beauchamp, and exited his car to initiate contact.

Just as officers are afforded the benefit of information or directions received from other officers when we consider whether the detaining officer had reasonable suspicion, *see, e.g., Dorsey v. Barber*, 517 F.3d 389, 395 (6th Cir. 2008), an individual's prior encounters with other officers should be taken into consideration when determining whether an encounter was coercive or consensual. Thus, the fact that Beauchamp first walked away from Officer Dees before Officer Fain located him and pulled up next to him would suggest to a reasonable person that the officers were targeting Beauchamp and therefore he would not feel free to leave. *See United States v. Tyler*, 512 F.3d 405, 410 (7th Cir. 2008) (noting that "whether the police informed the person that he was suspected of a crime or the target of an investigation" is a relevant factor when determining whether a reasonable person would feel free to leave); *United States v. Fusci*, No. 92-2126, 1993 WL 53106, at *2 (10th Cir. Feb. 25, 1993) (unpublished order) (discussing how the agent's actions "would tend to communicate to a reasonable person that, as the specific target of the agents' investigation, he was unable to terminate the encounter" (internal quotation marks omitted)); *United States v. Kerr*, 817 F.2d 1384, 1387 (9th Cir. 1987) ("[S]everal facts suggest that [the defendant] reasonably perceived that he was the target of [the officer's] investigation and thus was not free to leave."); *United States v. Saperstein*, 723 F.2d 1221, 1226 (6th Cir. 1983) (concluding that a reasonable person in the defendant's position would not feel free to leave when, among

other factors, the DEA agent informed the defendant that he had information about the defendant's involvement in drug trafficking).  In fact, Officer Fain acknowledged that Beauchamp "didn't want to be there with [him]."

Second, a reasonable person in Beauchamp's position would perceive that the officer's instructions that he stop and that he move around the fence required compliance and restricted his ability to walk away.  By this point, Beauchamp had indicated that he did not want to speak with the police by walking away two times; a reasonable person would not have felt free to walk away a third time after an officer had given him express instructions to do otherwise.  *See United States v. Johnson*, 620 F.3d 685, 690–91 (6th Cir. 2010) (holding that a reasonable person would not feel free to leave when two officers arrived in marked police cars and ordered defendant to stop); *Smith*, 594 F.3d at 539 (holding that once a police officer asked the defendant to stop, a reasonable person would not feel free to leave); *United States v. Richardson*, 385 F.3d 625, 630 (6th Cir. 2004) (holding that a reasonable person would not feel free to leave when a police officer told the defendant to "just hang out right here for me, okay?"); *Northrop v. Trippett*, 265 F.3d 372, 380 (6th Cir. 2001) (holding that a reasonable person would not feel free to leave when, after defendant sought to leave the area, one officer directed another officer to stop him and the officers asked him to produce identification); *United States v. Buchanon*, 72 F.3d 1217, 1223 (6th Cir. 1995) (noting that words requiring compliance may be enough to make a reasonable person feel that they are not free to leave).

The interaction at the fence is also the moment of the seizure because it was when Beauchamp complied with the officer's instructions and submitted to the officer's show of authority.  "[W]hat may amount to submission depends on what a person was doing before the show of authority . . . ."  *Brendlin*, 551 U.S. at 262.  Here, Beauchamp was walking away from the officer and was separated from him by a wrought iron fence. Upon the officer's instruction, he stopped and walked toward the officer, and again upon the officer's instruction, walked around the fence that separated them.  Just as "[s]topping after being ordered to stop triggers the Fourth Amendment," *Johnson*, 620

F.3d at 691, so too does changing course and complying with an officer's requests. *See also United States v. Jones*, 562 F.3d 768, 774–75 (6th Cir. 2009) (holding that defendant was not seized until he complied with officer's order to stop); *Smith*, 594 F.3d at 539 n.4 (holding that defendant was seized when officers instructed him to stop and he complied); *cf. California v. Hodari D.*, 499 U.S. 621, 625–26 (1991) (holding that, assuming that officer's car pursuit constituted a "show of authority," defendant was not seized when he ran away). For these reasons, we conclude that Beauchamp was seized when, in compliance with Officer Fain's instructions, he stopped, turned around, faced the uniformed officer and the marked patrol car, and began to walk toward the officer.

It is clear that the police do not make unreasonable seizures "merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen." *United States v. Drayton*, 536 U.S. 194, 200 (2002); *see also United States v. Davis*, 514 F.3d 596, 607 (6th Cir. 2008) (noting that, in a consensual encounter, "law enforcement officers may ask citizens 'general questions without having any reasonable suspicion of criminal activity, so long as the officers refrain from the type of intimidating behavior that would lead a reasonable person to believe that the person was not free to leave'") (quoting *United States v. Waldon*, 206 F.3d 597, 603 (6th Cir. 2000)). But that is not what happened in this case. Here, Officer Fain targeted Beauchamp by driving up to him after he had already walked away from another officer and, as Beauchamp continued to walk away, specifically instructed him to stop and to change the direction in which he was going.

The dissent's view that we must defer to the district court's conclusion that the initial encounter between Fain and Beauchamp was consensual is infirm for two reasons. First, the dissent applies only the highly deferential "clear error" standard of review reserved for factual findings; Dissent at 19, however, the question of consent is a conclusion of law which this court reviews *de novo*. *Moon*, 513 F.3d at 536. Taking factual inferences in the light most favorable to the government does not mean we must analyze the encounter strictly from the viewpoint of the police officer. Rather, *de novo* review requires this court to draw its own conclusions from the facts about whether,

when placed in the shoes of Beauchamp, a reasonable person would have felt free to leave.  *Mendenhall*, 446 U.S. at 554.

Second, the dissent focuses on testimony and argument that characterizes Officer Fain's instructions to Beauchamp as "asking" him to stop and come around the side of the fence, and posits that this court must accept the term "ask" at face value and, therefore, find the stop consensual.  Dissent at 20.  Again, this would deny the court its *de novo* interpretation of the "totality of the circumstances," including Beauchamp's prior encounter with Officer Dees; Beauchamp's clear desire to avoid further police contact; the targeting and pursuit of Beauchamp by a second, uniformed, officer; and Officer Fain's confronting Beauchamp, requesting that he stop and come around to his side of the fence.[3]  Under these circumstances, just as when an officer follows someone and stops him to "ask" for identification, or to "ask" him to exit his vehicle, Fain's encounter with Beauchamp does not lose its coercive character simply because he was referred to on the record as having "asked" for Beauchamp's compliance as opposed to "ordering" it.  Such a distinction is purely semantic.  Regardless of how one labels Officer Fain's requests, a reasonable person would not have felt free to leave or to ignore him, and thus Beauchamp was seized.

## 2. Reasonable and Articulable Suspicion

Having determined that the stop was not consensual, we must next consider whether it was a constitutional investigatory (or *Terry*) stop.  We engage in a two-part analysis in order to evaluate the constitutionality of an investigative stop.  First, we consider "'whether there was a proper basis for the stop, which is judged by examining

---

[3]The dissent mischaracterizes our analysis of whether Beauchamp's compliance with the officer's "asking" actually constituted a consensual exchange, noting: "Appellate factfinding is a rare and exotic animal, and often seems out of place too.  Its appearance warrants explanation in the manner that, say, a rhinoceros in Central Park does."  Dissent at 20.  But there was no appellate factfinding here, only fidelity to the *de novo* standard of review.  And it is noteworthy that our *de novo* analysis need no more explanation than the appearance of the dissent's rhinoceros in Central Park, since there is a zoo in Central Park and if one went to the Central Park Zoo one could expect to see a rhino.  So too, when the court conducts a *de novo* review, it literally looks at the totality of the circumstances "anew." *United States v. Raddatz*, 447 U.S. 667, 690 (1980) (Stewart, J., dissenting)("'review de novo' means 'that the court should make an independent determination of the issues.'"); *see also United States v. Silverman*, 861 F.2d 571, 576 (9th Cir. 1988) ("[u]nder the *de novo* standard of review, we do not defer to the lower court's ruling but freely consider the matter anew, as if no decision had been rendered below.").

whether the law enforcement officials were aware of specific and articulable facts which gave rise to reasonable suspicion.'" *United States v. Davis*, 430 F.3d 345, 354 (6th Cir. 2005) (quoting *United States v. Garza*, 10 F.3d 1241, 1245 (6th Cir. 1993)). Second, if the stop was proper, we then consider "'whether the degree of intrusion . . . was reasonably related in scope to the situation at hand, which is judged by examining the reasonableness of the officials' conduct given their suspicions and the surrounding circumstances.'" *Id.* (quoting *Garza*, 10 F.3d at 1245) (omission in original). Beauchamp only challenges the constitutionality of the stop on the first prong.

Under the first prong, the officer must have "reasonable, articulable suspicion that the person has been, is, or is about to be engaged in criminal activity." *United States v. Place*, 462 U.S. 696, 702 (1983). Such suspicion "must be based on specific, objective facts." *Brown v. Texas*, 443 U.S. 47, 51 (1979). It requires that "the detaining officers . . . have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417–18 (1981). As explained in *Terry*, an "inchoate and unparticularized suspicion or 'hunch'" will not do. *Terry*, 392 U.S. at 27. In making this determination, we must consider the totality of the circumstances as they existed at the time of the stop. *United States v. McCauley*, 548 F.3d 440, 443 (6th Cir. 2008).

The district court found that the totality of the circumstances consisted of five facts. Beauchamp was: (1) recognized by an officer from previous encounters; (2) at 2:30 in the morning; (3) in a housing project that was the source of many drug complaints; (4) with another individual; and (5) he hurriedly walked away from a police officer while avoiding eye contact.

The first fact is erroneous because the officer did not recognize Beauchamp until after the search began, so it does not factor into this analysis.

The second and third facts—the high-drug complaint location and the early morning hour—"'may not, without more, give rise to reasonable suspicion,' but they may be considered in the totality of the circumstances." *Johnson*, 620 F.3d at 692 (quoting *United States v. Caruthers*, 458 F.3d 459, 467 (6th Cir. 2006)). These factors

would apply to anyone who was in the housing project early that morning, and so they "should not be given undue weight." *United States v. See*, 574 F.3d 309, 314 (6th Cir. 2009). In particular, the high-crime or high-drug activity label must be applied carefully. Unless grounded in factual accuracy, it "can easily serve as a proxy for race or ethnicity." *United States v. Montero-Camargo*, 208 F.3d 1122, 1138 (9th Cir. 2000) (en banc), *cert. denied*, 531 U.S. 889 (2000); *see also Caruthers*, 458 F.3d at 467 (observing that "labeling an area 'high-crime' raises special concerns of racial, ethnic, and socioeconomic profiling"). These concerns are "especially appropriate" in this case because Officer Dees did not observe Beauchamp engage in any type of behavior that is consistent with drug activity. *See Johnson*, 620 F.3d at 693. Officer Dees saw Beauchamp interact with another person, and then walk away. *Cf. United States v. Paulette*, 457 F.3d 601, 602, 606 (6th Cir. 2006) (holding that officers had reasonable suspicion that defendant in high-crime area had engaged in criminal activity when officers saw movements that were consistent with a hand-to-hand drug transaction).

The fourth fact—being seen with another individual—is not probative of criminal activity. Simply talking to someone else, without more, is innocent activity and does not indicate that a crime is happening or is about to take place. *See id.*

The fifth fact—hurriedly walking away from an officer without making eye contact—similarly does not rise to the level of independent suspicion. The Supreme Court has explained that "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion," *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000), and we have held that "the speed of the suspect's movements may be relevant in the totality of the circumstances," *Caruthers*, 458 F.3d at 466. Consideration of these factors has led to an extensive debate about what types of responses to police arrival arouse a suspicion of wrongdoing. *See Johnson*, 620 F.3d at 694–95 (collecting cases). Nevertheless, it is clear that walking away from an officer does not create such a reasonable suspicion. *Florida v. Royer*, 460 U.S. 491, 498 (1983); *see also United States v. Patterson*, 340 F.3d 368, 372 (6th Cir. 2003) (stating that walking away from police "constitutes a factor to be outrightly dismissed"). In those cases in which we have found that walking away

from police does contribute to reasonable suspicion, specific facts have shown that the defendant's behavior was otherwise suspicious. *See, e.g., Caruthers*, 458 F.3d at 466–67 (finding reasonable suspicion when the defendant hurried away from an officer and "hunched down" by a wall as if to conceal contraband or reach for a weapon).

Nothing about the conduct at issue in this case suffices to transform a permissible walk away from a police officer into a suspicious act. Beauchamp also did not make eye contact with the officer. But what if he had and then looked away? His behavior may then have been described as "furtive" or "evasive." The ambiguity of Beauchamp's conduct may be susceptible to many different interpretations, but that does not render it suspicious. An inquiry into reasonable suspicion looks for the exact opposite of ambiguity: objective and particularized indicia of criminal activity. If cases are to be decided on reality and not on fiction, the facts of Beauchamp's response to the officer do not meet the constitutional standard. *See Wardlow*, 528 U.S. at 130–31 (noting that "avoid[ing] eye contact or even sneer[ing] at the sight of an officer" . . . "would not justify a *Terry* stop or any sort of *per se* inference").

The district court found that other factors—Beauchamp's nervousness, evasive answers, and low pants—could be factored into the totality of the circumstances analysis. But the officer only became aware of these factors after he had seized Beauchamp. As reasonable suspicion to make a stop cannot be justified by facts that become apparent only after a seizure, these facts are irrelevant to the court's analysis. *See United States v. McCauley*, 548 F.3d 440, 443 (6th Cir. 2008).

In sum, the totality of the circumstances consists of contextual factors that apply to everyone in the housing project and Officer Fain's testimony that Officer Dees observed Beauchamp walk hurriedly away from him without making eye contact. Certainly there are situations in which innocent acts, taken together, can amount to reasonable suspicion. *United States v. Sokolow*, 490 U.S. 1, 9–10 (1989). But the facts here are insufficient: Beauchamp's exercise of his right to walk away—even if the walk was made hurriedly, briskly, or snappily—does not turn his otherwise innocuous behavior into the conduct of a "suspicious suspect." Thus, we find that the officers did

not have reasonable suspicion to detain Beauchamp, and the stop was an illegal seizure conducted in violation of the Fourth Amendment.

## C. The Consent

Finally, we consider whether Beauchamp voluntarily consented to a search of his person, and if voluntarily given, whether that consent dissipated the taint of the prior Fourth Amendment violation.  Because the district court did not consider whether Beauchamp's consent to conduct the search was tainted, we will consider *de novo* whether the illegal stop tainted consent.  *United States v. Shaw*, 464 F.3d 615, 627 (6th Cir. 2006).

### 1. Voluntariness

While the Fourth Amendment protects citizens against unreasonable searches and seizures, a search of a person is not unreasonable if that person gives free and voluntary consent.  *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973); *United States v. Kelly*, 913 F.2d 261, 265 (6th Cir. 1990).  The government bears the burden of proving, through "clear and positive testimony" that the consent to search was given voluntarily. *United States v. Salvo*, 133 F.3d 943, 953 (6th Cir. 1998).  Consent is voluntary when it is "unequivocal, specific and intelligently given, uncontaminated by any duress or coercion." *United States v. Moon*, 513 F.3d 527, 537 (6th Cir. 2008) (internal citations omitted).  Voluntariness is determined by examining the totality of the circumstances. *See Bustamonte*, 412 U.S. at 227; *United States v. McCaleb*, 552 F.2d 717, 720 (6th Cir. 1977).  Several factors should be examined in the consent calculus.  First, a court should examine the characteristics of the accused, including the age, intelligence, and education of the individual; whether the individual understands the right to refuse to consent; and whether the individual understands his or her constitutional rights. *See United States v. Jones*, 846 F.2d 358, 360 (6th Cir. 1988).  While the police do not have to inform an individual of his right to refuse, the absence of such a warning is considered in the totality of the circumstances analysis. *See Bustamonte*, 412 U.S. at 227.  Second, a court should consider the details of the detention, including the length and nature of detention,

*id.* at 226; the use of coercive or punishing conduct by the police, *id.* at 226; and indications of "more subtle forms of coercion that might flaw [an individual's] judgment," *United States v. Watson*, 423 U.S. 411, 424 (1976). We carefully examine cases in which the government claims that the defendant consented. *See United States v. Worley*, 193 F.3d 380, 386 (6th Cir. 1999).

Police coercion vitiated any consent Beauchamp may have given in this case, and thus consent could not have been made freely or voluntarily. Without being told that he could refuse, Beauchamp said "yes" to Officer Fain's request to search after another uniformed officer had arrived on the scene. More importantly, Beauchamp gave his response immediately after Officer Fain had placed his hands on Beauchamp's body to conduct the frisk. A scared, defenseless man is not in a position to say no to a police officer whose hands are still on or just removed from his body while another officer is standing just a few feet away. *See Bustamonte*, 412 U.S. at 229 (noting that "account must be taken of . . . the possibly vulnerable subjective state of the person who consents" in considering the totality of the circumstances); *Worley*, 193 F.3d at 386 (holding that consent to search was not freely given to two officers but was "merely a response conveying an expression of futility in resistance to authority or acquiescing in the officers' request"); *United States v. Young*, 318 F. App'x 407, 410 (6th Cir. 2009) (unpublished opinion) (noting that a scared and upset defendant may, dependent on the facts, show duress that factors into the consent calculus).

In each and every situation that morning, police conduct had overborne Beauchamp's will. He was repeatedly prevented from exercising his right to walk away, and, in effect, to say "no." Because "[a] suspect's knowledge of a prior illegal search can also give rise to a sense of futility," the police conduct in this case easily could have exerted tremendous pressure on Beauchamp to acquiesce. *United States v. Haynes*, 301 F.3d 669, 683 (6th Cir. 2002). The district court failed to consider the implicitly coercive nature of these events, and instead focused on the absence of flashing lights or drawn weapons. We find that the district court erred in finding that the prosecution met its burden of showing that Beauchamp's consent was free, valid, and voluntary because

a consideration of the series of encounters that morning and the details of Officer Fain's interaction with Beauchamp indicate that Beauchamp merely acquiesced to the authority of the officer. *See Bumper v. North Carolina*, 391 U.S. 543, 548–49 (1968) (holding that the prosecution's "burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority"); *Jones*, 846 F.2d at 361 (holding that consent was involuntary in part due to psychological impact of coercive sequence of events). Thus, the search was unreasonable pursuant to the Fourth Amendment.

## 2. Attenuation

Even if Beauchamp had voluntarily consented, however, the evidence must be suppressed because it is tainted by the illegality of the initial stop. The Supreme Court has held that if consent to search is obtained after an illegal seizure, the consent is tainted by the illegality and does not justify the search. *Royer*, 460 U.S. at 507–08. We have repeatedly followed this precedent, holding that "evidence obtained pursuant to the consent to search must be suppressed" if the consent was given after an illegal seizure. *United States v. Lopez-Arias*, 344 F.3d 623, 629 (6th Cir. 2003); *see also United States v. Richardson*, 949 F.2d 851, 858–59 (6th Cir. 1991) (holding that an illegal arrest tainted a subsequent consent to search); *United States v. Bradley*, 922 F.2d 1290, 1296 (6th Cir. 1991) (holding that "[d]efendant's consent to search was tainted by an illegal arrest under State law"); *United States v. Buchanan*, 904 F.2d 349, 355–56 (6th Cir. 1990) (holding that consent to search was tainted because prior warrantless entry into defendant's home was not justified). Thus, for the seized evidence to be admissible, "not only must the consent be valid, *i.e.*, voluntary . . . but the causal chain between the illegal seizure and the consent must be broken to avoid the consequences of the exclusionary rule." *Lopez-Arias*, 344 F.3d at 629.

As the taint of the unconstitutional seizure "[can] be purged when the suspect's subsequent consent is the 'product of an intervening act of free will,'" *Richardson*, 949 F.2d at 858 (quoting *United States v. Grant*, 920 F.2d 376, 388 (6th Cir. 1990)), the question before us is "whether . . . the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently

distinguishable to be purged of the primary taint," *Wong Sun v. United States*, 371 U.S. 471, 488 (1963) (internal quotation marks and citations omitted).  In order to determine if the consent is sufficiently attenuated from the illegal seizure, we may consider a number of factors, including: the length of time between the illegal seizure and the consent; the presence of intervening circumstances; the purpose and flagrancy of the official misconduct; and whether the officers read the suspect his *Miranda* rights before he consented.  *Kaupp v. Texas*, 538 U.S. 626, 632–33 (2003); *Lopez-Arias*, 344 F.3d at 630.  No single factor in this analysis is dispositive of attenuation.  *Brown v. Illinois*, 422 U.S. 590, 603 (1975).  The government bears the burden of persuasion.  *Kaupp*, 538 U.S. at 633.

    None of the relevant factors, either individually or in the aggregate, dissipates the taint.  First, just a few minutes passed between the illegal seizure and the consent.  Officer Fain asked Beauchamp a few questions, conducted a brief frisk, and then without reading him his *Miranda* rights or informing him of his right to refuse, asked him for consent to search.  The absence of any intervening time between the seizure and the consent strongly suggests that the taint of the illegality did not dissipate.  *See Brown*, 422 U.S. at 604 (finding that a separation of two hours without an intervening set of circumstances did not dissipate the taint); *Lopez-Arias*, 344 F.3d at 630 (finding that a lapse of 30 minutes did not dissipate the taint); *Richardson*, 949 F.2d at 859 (finding that a lapse of 20 minutes did not dissipate the taint); *Buchanan*, 904 F.2d at 356 (finding that a lapse of one hour did not dissipate the taint).

    Second, there were no intervening circumstances.  *Brown*, 422 U.S. at 604 (finding that the absence of an intervening event indicated that the taint was not dissipated).  Intervening circumstances that effectively attenuate the consent from the illegal seizure "are those that sever the causal connection between the illegal arrest and the discovery of the evidence." *United States v. Shaw*, 464 F.3d 615, 628–29 (6th Cir. 2006) (quoting *United States v. Reed*, 349 F.3d 457, 464 (7th Cir. 2003)).  In particular, we have held that if a suspect's response to an illegal stop is a new and distinct crime, such as flight or use of force, any evidence recovered incident to the arrest for the

subsequent crime is not tainted by the unlawfulness of the initial detention. *See United States v. Castillo*, 238 F.3d 424 (Table), 2000 WL 1800481, at \*5–6 (6th Cir. Nov. 28, 2000) (unpublished opinion) (holding that a suspect's high-speed flight from an unlawful detention purged taint that may have resulted from his detention, and rendered the drug evidence found incident to his arrest for flight admissible); *United States v. Jefferson*, 182 F.3d 919 (Table), 1999 WL 519298, at \* 4 (6th Cir. July 15, 1999) (unpublished opinion) (holding that defendant's flight and use of force against officers constituted intervening circumstances that purged taint). Unlike in *Castillo* and *Jefferson*, however, the police discovered the evidence in this case—the $1300 in cash and the plastic baggie—before Beauchamp's brief struggle began. Thus, Beauchamp's struggle cannot serve as an intervening circumstance because it does not come between the illegal seizure and the discovery of the evidence; there is no break in the chain. *See Shaw*, 464 F.3d at 629 (holding that post-arrest discovery of incriminating evidence is not an intervening circumstance that breaks the causal chain); *United States v. Baldwin*, 114 F. App'x 675, 682 (6th Cir. 2004) (unpublished opinion) (holding that evidence discovered *before* defendant attempted to resist and flee was tainted by illegal seizure and must be suppressed).

Third, the purpose and flagrancy of the officer's conduct do not tend to dissipate the taint. This is an important factor because "it is tied directly to the rationale underlying the exclusionary rule, deterrence of police misconduct." *Reed*, 349 F.3d at 464–65. While the officers' conduct in this case may not qualify as flagrant, the purpose of the stop seems to be "investigatory," undertaken as an "expedition for evidence in the hope that something might turn up." *Brown*, 422 U.S. at 605. Officer Fain did not stop until he found something to pin on Beauchamp. He did not engage Beauchamp in a consensual encounter. He did not have reasonable suspicion to stop and detain him. Even if the stop had been legal, the district court found that he did not have probable cause to make an arrest until after he pulled back Beauchamp's underwear on a public street and looked inside. As we have previously explained, "[t]his type of police misconduct—stopping a suspect without probable cause for investigatory purposes—is precisely the type of conduct that *Brown* and its progeny seeks to deter." *Baldwin*, 114

F. App'x at 685.  Accordingly, as none of the factors suggest that Beauchamp's consent is due to an intervening act of free will, the evidence was obtained by exploiting the initial illegality and the taint of the illegal seizure is not dissipated.  We find that the government has failed to carry its burden of proving that the consent was sufficiently attenuated from the original seizure to render the seized evidence admissible, and that Beauchamp's motion to suppress should have been granted.

### III. CONCLUSION

For the foregoing reasons, we reverse the district court's order denying the motion to suppress and remand for further proceedings.

———————————

**DISSENT**

———————————

KETHLEDGE, Circuit Judge, dissenting.  Standards of review are supposed to mean something.  The standard we are bound to apply here is as deferential as they come:  we consider the evidence in the light most favorable to the government, deferring particularly to the district court's credibility determinations; and having done all that, we then review the district court's factual findings for clear error.  *See United States v. Montgomery*, 621 F.3d 568, 572 (6th Cir. 2010).  Under that standard, if an officer testifies that he "asked" the defendant to speak with him, Suppression Hearing Tr. at 7, 19; and the magistrate judge who observes that testimony finds the officer credible, Report and Rec. at 5; and the district judge agrees, Order Adopting R. & R. at 4-5; and the defendant himself expressly concedes in both of his briefs to this court that the officer "*asked* Mr. Beauchamp to step around the fence and talk to him[,]" Appellant Br. at 15, Reply at 3 (emphasis added); then it is not our prerogative to convert the "asked" into an "instructed" and find the encounter coercive as a result.  Yet that is what our court does today.  The court then goes on to find a second constitutional violation, holding that the officer's search of Beauchamp's person was coercive even though Beauchamp unequivocally consented to it.  The majority's premise for that holding—that a recently frisked person is necessarily too scared to give valid consent to search—has little, if any, support in the law.

But to begin with first principles:  "Law enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen."  *United States v. Drayton*, 536 U.S. 194, 200 (2002).  Thus, officers may approach a person and ask questions "without having any reasonable suspicion of criminal activity," so long as they refrain from "intimidating behavior that would lead a reasonable person to believe that the person was not free to leave."  *United States v. Waldon*, 206 F.3d 597, 603 (6th Cir. 2000).  "Whether an encounter between

a police officer and a citizen is consensual," therefore, "depends on the officer's objective behavior[.]" *Id.* Coercive behavior includes "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *United States v. Peters*, 194 F.3d 692, 697 (6th Cir. 1999) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)).

None of those things occurred here. Fain was alone when he approached Beauchamp, and did not display his weapon or activate his cruiser lights. What he did, rather, is what the Supreme Court in *Drayton* said he is entitled to do: approach a person on a public street and ask whether the person is willing to speak with him. That the officer asks, rather than commands, is critical; and here Fain twice testified that he "asked" Beauchamp to step around the fence and talk with him. The district court found that Fain was credible in all respects, and thus that Fain "asked" rather than commanded Beauchamp to do these things. Beauchamp does not even contest this finding—rather, he concedes the point in his briefs. Usually we take a party at his word on that sort of thing. But our court sweeps everything aside—the testimony, the findings, the concession, and with them all, surely, our standard of review—and itself finds that Fain "instructed" rather than asked Beauchamp to stop. Maj. Op. at 3. The finding is thereafter repeated 11 times in the opinion, eventually ripening into assertions that Fain "had given [Beauchamp] express instructions" to stop and "specifically instructed him" to do so. *Id.* at 7, 8.

Appellate factfinding is a rare and exotic animal, and often seems out of place too. Its appearance warrants explanation in the manner that, say, a rhinoceros in Central Park does. But there is no explanation for the majority's factfinding here. The majority does not explain why we should—or more to the point, lawfully *can*—set aside the district court's determination of Fain's credibility in favor of our own. It does not explain—or even attempt to explain—why the district court's factual finding that Fain "asked" rather than instructed Beauchamp was clearly erroneous. Indeed our court does not even acknowledge that the district court made the finding at all. Instead, our court

merely announces, near the outset of its factual summary, that Fain "instructed" Beauchamp to stop and come around the fence—as if this factual issue, so central to the issue before us, were undisputed. Which it is, but not in the way our court suggests; for what is undisputed here is that "Officer Fain *asked* Mr. Beauchamp to step around the fence and talk to him." Appellant Br. at 15 (emphasis added). Our court oversteps its bounds in finding the contrary.

Absent this putative "instruction," there is nothing about Fain's conduct that was coercive. But our court broadens the scope of its inquiry: it observes that, prior to Fain's approach, another officer, Dees, had driven his cruiser in some proximity to Beauchamp. That proximity is undefined, but apparently was not very close, because not a word passed between them, and Beauchamp walked away without even "making eye contact with the officer." Maj. Op. at 2. Viewed in the light most favorable to the government, or even neutrally, one might characterize this interaction as merely a sighting. But our court calls it an "encounter"—thereby powering up the machinery of the Fourth Amendment—and asserts that Beauchamp then "indicated" that he did not want to talk to the police when he walked away. *Id.* at 5, 7. The result, in the majority's construct, is that when Fain then approached Beauchamp on a different street—over Beauchamp's objection, so to speak—a reasonable person would think that he had been "target[ed]" by the officers and thus was not "free to leave." *Id.* at 6.

Whatever the merits of this theory as a psychological matter, it is untenable as a legal one. For two reasons: first, the theory rests upon inferences that we should not fairly make when viewing the record as we are supposed to view it. To call Dees' mere-proximity approach an "encounter" is a stretch; to say that Beauchamp then "indicated" to the officers that he did not want to talk to them, is even more so. To make those inferences is to view the record in the light most favorable to reversal, not affirmance.

Second, the majority's theory—that if a person feels targeted by officers, his encounter with them is coercive as a result—is contrary to the caselaw. In *Florida v. Rodriguez*, 469 U.S. 1 (1984) (per curiam), two narcotics detectives, McGee and Facchiano, followed three men, Rodriguez, Ramirez, and Blanco, from a ticket counter

in the Miami Airport all the way to the gate area for their flight. Eventually they all rode up an escalator together, with the detectives standing behind the other three. Although the officers wore plain clothes, the Court's opinion makes clear that the three men recognized the detectives as such:

> At the top of the escalator stairs, Blanco looked back and saw the detectives; he then spoke in a lower voice to Ramirez. Ramirez turned around and looked directly at the detectives, then turned his head back very quickly and talked to Blanco.
>
> As the three cohorts left the escalator single file, Blanco turned, looked directly at [Rodriguez], and said, "Let's get out of here." He then repeated in a much lower voice, "Get out of here." [Rodriguez] turned around and caught sight of the detectives. *He attempted to move away*, in the words of Officer McGee, "His legs were pumping up and down very fast and not covering much ground, but the legs were as if the person were running in place."

*Id*. at 3-4 (emphasis added). Rodriguez soon gave up trying to run away—the airport must have been crowded near the top of that escalator—and McGee "asked [Rodriguez] if they might talk." *Id.* Rodriguez agreed, though he surely was not happy about it; and later he consented to a search of his luggage. There the officers found cocaine, but the Florida courts suppressed that evidence on Fourth Amendment grounds.

It is obvious from the passage quoted above that the three men felt targeted by the detectives. It is just as obvious that Rodriguez tried to run away. That fact, along with the trio's verbal exchanges on the escalator, provided a much stronger "indicat[ion]" than we have here that Rodriguez "did not want to speak with the police[.]" Maj. Op. at 7. Yet the Supreme Court did not hold, as the majority does in this case, that all this targeting, and all these indications, rendered Rodriguez's encounter with the officers coercive. Instead the Supreme Court held—in a summary reversal, no less—that "[t]he initial contact between the officers and [Rodriguez], where they simply asked if he would step aside and talk with them, was clearly the sort of consensual encounter that implicates no Fourth Amendment interest." 469 U.S. at 5-6. The same is true here, and our court conflicts with *Rodriguez* by holding the contrary.

The majority also observes that "Officer Fain acknowledged that Beauchamp 'didn't want to be there with [him].'" Maj. Op. at 7. Why the majority finds Fain's testimony credible on this point, but not on others, the majority does not say; but the point provides zero support for the majority's conclusion that Fain's encounter with Beauchamp was coercive. "[T]he 'reasonable person' test presupposes an *innocent* person[,]" *Florida v. Bostick*, 501 U.S. 429, 438 (1991) (emphasis in original); and thus whether Beauchamp wanted to "be there"—with 18 rocks of crack cocaine in his boxer shorts—is completely beside the point. The district court did not clearly err in finding the initial encounter between Fain and Beauchamp to be consensual.

\*    \*    \*

The majority finds yet another constitutional violation in this case, this time with respect to Fain's search of Beauchamp's person. In the majority's view that search was coercive, even though Beauchamp consented to it. The majority reasons: "More importantly, Beauchamp gave his response immediately after Officer Fain had placed his hands on Beauchamp's body to conduct the frisk. A scared, defenseless man is not in a position to say no to a police officer whose hands are still on or just removed from his body while another officer is standing just a few feet away." Maj. Op. at 14. As an initial matter, this characterization is inaccurate in suggesting that Dees was "standing just a few feet away" when Beauchamp consented to the search. As the majority itself appears to recognize elsewhere in its opinion, *see* Maj. Op. at 3 n. 2, each officer testified that Dees had not yet arrived when Beauchamp gave consent to search his person. (Whether Dees thereafter arrived while the search was ongoing, or after it was done, is unclear.) We should analyze the validity of Beauchamp's consent accordingly.

But that is a minor point in comparison to the potential sweep of the majority's holding on this issue. The supposedly coercive circumstances presented here—a protective frisk, followed by consent to search—are hardly unique. *Cf. Kolender v. Lawson*, 461 U.S. 352, 364 (1983) (Brennan, J., concurring) ("Our case reports are replete with examples of suspects' cooperation during *Terry* encounters, even when the suspects have a great deal to lose by cooperating"). Other circuits routinely uphold the

validity of the defendant's consent to search in these circumstances.  *See, e.g.*, *United States v. Campa*, 234 F.3d 733, 740 (1st Cir. 2000) (consent to search was valid despite officer's frisk moments before); *United States v. Kikumura*, 918 F.2d 1084, 1093 (3d Cir. 1990) (rejecting the defendant's argument that an officer's "stop and frisk" moments before a search requires "stricter scrutiny of the consent"); *United States v. Dupree*, 202 F.3d 1046, 1050 (8th Cir. 2000) (consent to search was valid despite officer's frisk moments before); *United States v. McRae*, 81 F.3d 1528, 1537 (10th Cir. 1996) (consent granted during officer's frisk was valid).  Our court creates a split with those circuits by holding the contrary.

It also bears mention that we throw the caselaw into incoherence by holding, as the majority does here, that a police officer's protective frisk renders coercive the rest of his encounter with the person who was frisked.  In a wide range of circumstances, the law permits a police officer to "place[] his hands" on a person's body, Maj. Op. at 14, in order to protect himself by means of a protective frisk.  We should not penalize officers for protecting themselves in ways the law expressly permits.  I think that is the effect of the majority's decision here.

I would affirm the district court's judgment, and thus I respectfully dissent.