NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0372n.06

No. 23-1766

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Aug 28, 2024
KELLY L. STEPHENS, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| DIONTE FIZER, | ) | MICHIGAN |
| Defendant-Appellee. | ) | |
| | ) | OPINION |
| | ) | |

Before: GILMAN, STRANCH, and LARSEN, Circuit Judges.

**JANE B. STRANCH, Circuit Judge.** Michigan State Police suspected Dionte Fizer of drug trafficking and illegal firearm possession and pulled him over in an east Michigan parking lot. Two minutes into the encounter, Fizer fled. The officers gave chase, apprehended Fizer, and recovered a firearm that he had discarded during the pursuit. Fizer was charged with possessing a firearm as an individual with a felony conviction, in violation of 18 U.S.C. § 922(g)(1). He moved to suppress the weapon, arguing that his initial seizure was unreasonable and that police discovered his firearm only as a product of that unlawful detention. The district court agreed and granted Fizer's motion. We **REVERSE**.

## I. BACKGROUND

Shohn Joyner, a special agent with the Drug Enforcement Administration (DEA), received a tip in May 2020 that Dionte Fizer was "involved in cocaine trafficking." The tip came from a confidential informant who explained that Fizer was supplied with cocaine by narcotics traffickers

operating out of an east Detroit music studio and that Fizer had acquired nine ounces of cocaine at the studio the preceding week. The source later informed Joyner that Fizer would be making another purchase on July 28, 2020, and would be "carrying a pistol" when he did.

On that day, Joyner and a fellow DEA agent took up surveillance of the music studio. Fizer drove past in the afternoon, the agents followed, and with help from a broader team they tailed Fizer for the next three hours. The agents "observed Fizer stop at three gas stations, stop in an unidentified woman's driveway, arrive and park at a residence that was associated with a previous arrest for misdemeanor marijuana possession," and visit "another address." At each of these stops, "Fizer had quick 'meetings' in which people would enter Fizer's car, stay for thirty seconds to a minute, and then leave."

Joyner relayed what the DEA had seen to troopers with the Michigan State Police. He informed them that Fizer was involved in narcotics trafficking, had prior felony convictions, and had apparently been engaged in drug transactions throughout the day. He also explained that a source had informed him that Fizer was carrying a firearm. He instructed the troopers to conduct a stop.

Michigan police stopped Fizer that evening. A "long line" of marked police cars assembled behind Fizer with lights flashing. "Fizer pulled into a parking lot and, as he continued to drive for a few seconds, one of the Troopers told him" to "stop the car." Fizer brought his car to a stop, turned it off, and rolled down his window. The officers parked directly behind him and drew their weapons.

A trooper immediately ordered Fizer to "open the door" and "turn off the car." Fizer responded by asking, through his open window, what he had done. The trooper ignored Fizer's question and directed him to "throw the keys out the window." "Fizer closed the window instead."

The trooper reiterated his order, shouting at Fizer to "throw the keys out the window now!" Fizer reacted by opening his door and again asking officers what he had done. The trooper replied that they would not be talking "about that now" and ordered Fizer to "throw the keys on the ground" for a third time. Fizer asked whether the troopers had a warrant and closed his door without relinquishing the keys.

Three officers responded to this sequence of events by retrieving a shield from their vehicle and stacking up behind it in preparation for approaching Fizer's car. As this was happening, Fizer lowered his window again and again asked why he was being detained. The trooper responded that Fizer was "under arrest" and repeated his order that Fizer "throw the keys out the window." Fizer asked what for, and the officer said they could discuss it when Fizer surrendered. Fizer then "closed his window, started his car, and sped off." The encounter lasted less than two minutes.

Police gave chase, following Fizer along residential roads at speeds of up to 80 miles per hour. After approximately four-and-a-half minutes, the officers executed a precision immobilization maneuver that stopped Fizer's vehicle. They placed Fizer under arrest "for fleeing and eluding." A trooper then retraced the path of the chase and discovered a loaded pistol in the front yard of a house along the route. When investigators showed Fizer a photo of the gun, he lamented that he would be "going back to prison" because he had not wiped it "for fingerprints or DNA."

Fizer was charged with one count of felon-in-possession under § 922(g)(1). He moved to suppress evidence of the firearm, and the district court held a hearing in which both Fizer and Joyner testified. The court subsequently granted Fizer's suppression motion in a 38-page order. The Government appeals.

## II.   ANALYSIS

In considering an order on a motion to suppress, we review the district court's legal conclusions de novo and its factual findings under the clear error standard. *United States v. Bailey*, 302 F.3d 652, 656 (6th Cir. 2002). The court's "factual inferences and credibility determinations" are afforded "due weight," and the evidence is viewed in the light most favorable to the party that prevailed below. *United States v. Beauchamp*, 659 F.3d 560, 565-66 (6th Cir. 2011) (quoting *United States v. Moon*, 513 F.3d 527, 536 (6th Cir. 2008)). The court's grant of Fizer's motion here depended on three premises: that his stop ripened into an arrest, that the arrest was not supported by probable cause, and that Fizer's abandonment of the firearm was a product of the unlawful arrest—not attenuated from it—making the firearm inadmissible as a fruit of that constitutional violation. We start and end with attenuation.

Abandoned property ordinarily may be seized without implicating the Fourth Amendment because a person who abandons property relinquishes his privacy interest in it. *See United States v. Tolbert*, 692 F.2d 1041, 1044-45 (6th Cir. 1982). At the same time, however, evidence "police derivatively obtain from an unconstitutional search or seizure" is inadmissible in criminal trials under the "exclusionary rule," a doctrine developed by the Supreme Court to enforce the Fourth Amendment's guarantees by deterring law enforcement from conducting unreasonable searches and seizures. *United States v. Williams*, 615 F.3d 657, 668 (6th Cir. 2010) (quoting *United States v. Pearce*, 531 F.3d 374, 381 (6th Cir. 2008)). The question here, then, is whether Fizer abandoned his firearm as a product of police misconduct (rendering it inadmissible) or as a product of events attenuated from any predicate misconduct (rendering it admissible). *See id.* (quoting *Wong Sun v. United States*, 371 U.S. 471, 488, 491 (1963)).

Attenuation is assessed by examining whether the evidence at issue was uncovered through law enforcement "exploitation" of an unconstitutional seizure "or instead by means sufficiently distinguishable" from the constitutional violation to purge it of its "primary taint." *Id.* at 668-69 (quoting *Wong Sun*, 371 U.S. at 488). Three factors guide the inquiry: the "temporal proximity" between the unlawful detention and the discovery of the incriminating evidence, "the presence of intervening circumstances," and "the purpose and flagrancy of the official misconduct." *Id.* at 669 (quoting *Brown v. Illinois*, 422 U.S. 590, 603-04 (1975)). We have addressed the effect of a defendant's unlawful response to an unconstitutional seizure—conduct implicating the second *Brown* factor—in a series of cases involving flight from an illegal stop.

We start with *United States v. Castillo*, No. 99-5463, 2000 WL 1800481 (6th Cir. Nov. 28, 2000). A suspect there was stopped on suspicion of drug trafficking. *See Castillo*, 2000 WL 1800481, at *1. As officers waited for a canine unit to arrive, the suspect regained access to his vehicle, "jumped inside[,]" and "fled at a high rate of speed." *Id.* A ten-to-fifteen-minute high-speed chase ensued, winding along residential roads until the fugitive's car landed in a ditch. *Id.* at *1-2, 6. The pursuing officers secured the area and recovered a bag containing drugs and cash abandoned in the nearby woods. *Id.* at *2. We explained that the suspect's high-speed flight supplied probable cause to arrest him for a new crime independent of the activity motivating the initial stop, and that this intervening event vitiated any constitutional "taint that might have resulted from" the original detention. *Id.* at *6. The abandoned evidence was therefore admissible as a product of the lawful arrest. *Id.*

The rule underlying *Castillo* became published law in *United States v. Allen*, 619 F.3d 518 (6th Cir. 2010). Officers there pulled over a car containing suspected drug traffickers. *See Allen*, 619 F.3d at 521-22. The vehicle "initially stopped" in response to law enforcement directives,

"but then fled," leading police "on a high-speed chase." *Id.* at 521, 526. Officers pursued the vehicle until they eventually succeeded in stopping it again. *See id.* at 521. They arrested both occupants and recovered drugs and a firearm in the corresponding search. *Id.* Based on the record there, we held that "the act of fleeing from police officers constituted a new, distinct crime that" entitled the officers to conduct an arrest, irrespective of the constitutionality of the original detention. *Id.* at 526. The evidence discovered in the search incident to that legitimate arrest was thus admissible. *Id.*

We applied *Allen* in *United States v. King*, 466 F. App'x 484 (6th Cir. 2012). Officers in *King* stopped a vehicle that, once again, was driven by a suspected drug dealer. *King*, 466 F. App'x at 485-86. The officers engaged the driver, obtained his identification documents, and returned to their squad car to run his license. *Id.* at 486. As they were processing the materials, the vehicle fled the scene. *Id.* The officers gave chase, pursuing the driver on residential streets at speeds of over seventy miles per hour until he crashed into another car. *See id.* They placed the driver under arrest and conducted a search that revealed drugs and a loaded firearm. *Id.* Though a legitimate basis for the initial stop was lacking, *King* held that the driver's subsequent high-speed flight was "an intervening independent act of free will" that supplied a standalone basis for arrest, purging any "taint from the initial unlawful" seizure. *Id.* at 488-89. Evidence uncovered in the search incident to that lawful arrest was attenuated from the original detention and admissible.

*Castillo*, *Allen*, and *King* stand for the principle that when a suspect's response to an illegal stop is itself a new, distinct crime, evidence uncovered as the product of an arrest for that crime will generally be attenuated enough from the initial unconstitutional detention to mitigate the need for exclusion. *See King*, 466 F. App'x at 488-89. A contrary result could "immunize" defendants "from prosecution for all crimes" committed following "police misconduct." *Castillo*, 2000 WL

1800481, at *5 (quoting *United States v. Bailey*, 691 F.2d 1009, 1017 (11th Cir. 1982)). The same rule—premised on the same underlying rationale—predominates throughout the circuits. *See United States v. Sprinkle*, 106 F.3d 613, 619 (4th Cir. 1997); *United States v. Pryor*, 32 F.3d 1192, 1196 (7th Cir. 1994); *United States v. Sledge*, 460 F.3d 963, 966 (8th Cir. 2006); *Bailey*, 691 F.2d at 1017. *But see United States v. Brodie*, 742 F.3d 1058, 1063 (D.C. Cir. 2014); *Jones v. State*, 745 A.2d 856, 872-73 (Del. 1999); *State v. Beauchesne*, 868 A.2d 972, 983-84 (N.H. 2005).

As in our prior cases, it is undisputed that the officers here suspected Fizer of drug trafficking and pulled him over. Here too, Fizer complied with the officers' initial commands to stop. But after just over two minutes, he "closed his window, started his car, and sped off." That flight supplied probable cause to arrest Fizer for the new, independent crime of fleeing and eluding. *See* Mich. Comp. Laws §§ 257.602a, 750.479a. Fizer abandoned his firearm in the midst of his flight, well after the fresh basis for arrest was evident. *Cf. Beauchamp*, 659 F.3d at 573-74. This "act of fleeing from police officers" was an intervening circumstance that purged any taint from the original detention. *See Allen*, 619 F.3d at 526.

Fizer acknowledges our published opinion in *Allen*, but argues that his case is different because his flight was a fearful response to the officers' threat of deadly force and "not intended as a new, distinct crime." The probable cause standard is an objective one, however, asking whether "the facts and circumstances within the arresting officer's knowledge were sufficient to warrant a prudent man in believing that the arrestee had committed or was committing an offense." *Hoover v. Walsh*, 682 F.3d 481, 499 (6th Cir. 2012) (brackets omitted) (quoting *Arnold v. Wilder*, 657 F.3d 353, 363 (6th Cir. 2011)). Viewed through that lens, the troopers here could reasonably have believed that, once Fizer fled, he had violated Michigan's fleeing and eluding statute and

could be arrested—no matter how reasonably Fizer feared the initial detention. *See District of Columbia v. Wesby*, 583 U.S. 48, 56-57 (2018).

Fizer's argument is rooted in the Supreme Court's reasonable suspicion cases. Those cases stand for the proposition that flight alone does not categorically supply reasonable suspicion. *Illinois v. Wardlow*, 528 U.S. 119, 129-30 (2000) (Stevens, J., concurring in part and dissenting in part). That is because there are "innocent reasons for flight from police," so "flight is not necessarily indicative of ongoing criminal activity." *Id.* at 125. A defendant may "be motivated to avoid the police by a natural fear or dislike of authority," a "distaste for police officers based upon past experience," a "fear of police brutality or harassment," a desire to avoid being mistakenly "apprehended as the guilty party," or myriad "other legitimate personal reasons." *See Miles v. United States*, 181 A.3d 633, 641 (D.C. 2018) (quoting *In re D.J.*, 532 A.2d 138, 142 n.4 (D.C. 1987)). The officers here, however, did not rely on Fizer's flight as a factor in the suspicion that justified the original stop—which all agree was legitimate—but as probable cause for the separate and distinct crime of "fleeing and eluding." *See* Mich. Comp. Laws §§ 257.602a, 750.479a. That probable cause determination stands independent from the reasonable suspicion inquiry underlying Fizer's initial stop.

Fizer does not argue that his case is distinguishable from the *Allen* trilogy under the other *Brown* factors, nor does he raise adjacent issues that might have affected the analysis. He does not contend that the first *Brown* factor (temporal proximity) alters the outcome. And it is hard to see how it could, since the suspects in our earlier cases also fled early in each encounter. *Castillo*, 2000 WL 1800481, at *4; *King*, 466 F. App'x at 488; *Allen*, 619 F.3d at 521. He does not suggest that the third *Brown* factor (the purpose and flagrancy of the officers' misconduct) changes anything. And there is no evidence that the officers' actions were calculated to generate an

arrestable response in a way that could make the value of applying the exclusionary rule more apparent. *See* 6 Wayne R. LaFave, *Search & Seizure* § 11.4(j) (6th ed.).

Given all this, even assuming a predicate constitutional deprivation occurred—a question we need not reach—there would be no basis for excluding Fizer's firearm. The district court erred in concluding otherwise.

### III.  CONCLUSION

For these reasons, we **REVERSE** the district court's order and **REMAND** for further proceedings consistent with this opinion.