NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a0028n.06

No. 11-5185

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED

**Jan 10, 2012**

LEONARD GREEN, Clerk

UNITED STATES OF AMERICA,            )
                                      )
        Plaintiff-Appellee,           )
                                      )   ON APPEAL FROM THE UNITED
v.                                    )   STATES DISTRICT COURT FOR THE
                                      )   MIDDLE DISTRICT OF TENNESSEE
KEVIN LAMONT HERRIN,                  )
                                      )
        Defendant-Appellant.          )


Before: SUHRHEINRICH, SUTTON, and COOK, Circuit Judges.


COOK, Circuit Judge. Defendant-Appellant Kevin Herrin appeals the denial of his motion to suppress evidence obtained during an encounter with police officers. We **AFFIRM** the district court's denial.


I.


Late one evening in May 2010, Officers Reco Hathaway and Bryant Mitchell patrolled a high-crime area of Murfreesboro, Tennessee. As their unmarked blue Expedition—well known in the area as a police vehicle—proceeded east on Eagle Street, the officers observed several men speaking to the driver of a parked vehicle through the vehicle's passenger-side window. The driver, whom officers later identified as defendant Kevin Herrin, apparently panicked at the sight of the

officers' approach and drove away at a high rate of speed, passing the officers and heading west on Eagle Street.

Seeing Herrin idle in an area known for drug sales and then race away at the sight of a police vehicle aroused the officers' suspicion. They decided to pursue Herrin—without lights or siren—to "see . . . who the vehicle belonged to, probably run the registration or see where it was going."

Attempting to follow Herrin, Officer Hathaway executed a 180-degree turn on Eagle Street and headed west. The officers lost sight of Herrin's vehicle shortly after the maneuver, and Hathaway doubled-back going east down Eagle Street. Hathaway then spotted the vehicle in an Eagle Street driveway, approximately one block from where the officers originally noticed the vehicle.

The parked vehicle sat empty in the driveway, with the driver-side door open and the dome light illuminating the interior of the car. Herrin, the apparent driver, stood on the home's porch knocking at the front door. The officers pulled their Expedition parallel to the vehicle, parking in the grass adjoining the driveway. According to Hathaway, the entire sequence of events took place in "a matter of seconds or maybe a minute or two."

Hathaway recognized Herrin from past encounters on Eagle Street. Not only had he arrested him in the past, but also Hathaway knew Herrin to be the suspect in several shootings and a murder.

Hathaway also knew that Herrin neither owned nor resided at that house and that Herrin's driver's license was suspended.

Officer Hathaway approached Herrin and, in the course of the questioning, Herrin admitted to driving under a suspended license. With this admission, Hathaway asked Herrin to stand by Officer Mitchell while Hathaway searched the area around the porch. Nestled between the porch and the house, a Glock .22 lay wrapped in a baby blanket. Upon finding the gun, Officer Mitchell handcuffed Herrin, advised him of his *Miranda* rights, and began to question him.

Herrin narrated his side of events, explaining that he fled after noticing the officers approaching on Eagle Street. Herrin's brother then called to warn him about a gun in his car. As a convicted felon, Herrin recognized the legal consequences of being stopped with the gun, so he parked in the driveway of 1301 Eagle Street to abandon the gun. Herrin admitted that he wrapped the gun in a baby blanket and placed it beside the porch.

The government prosecuted Herrin for being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g). Herrin moved to suppress the firearm and the incriminating statements that he made to Officers Hathaway and Mitchell. The district court, following a hearing, denied the motion rejecting Herrin's characterization of the encounter as a traffic stop:

> Officer Hathaway testified that his vehicle pulled into the driveway at 1301 Eagle Street. Parked in the grass with the lights of the police vehicle shining towards the porch. The car was not blocking the defendant's car. The parties have argued about whether this was a traffic stop. In the Court's view, it was not a traffic stop. The car

was already stopped. Mr. Herrin was already at the front door knocking on the door. In the Court's view, that's not a traffic stop.

Finding no violation of the Fourth Amendment, the court explained that the officers' questioning of Herrin began as a consensual encounter when Officer Hathaway approached Herrin as Herrin knocked on the door of the residence, evolved into a investigative detention after Herrin admitted driving with a suspended license, and concluded as an arrest after Officer Hathaway found the gun.

Herrin pleaded guilty, but reserved his right to challenge the denial of the motion to suppress. The court sentenced Herrin to 30 months' imprisonment.

II.

Because Herrin does not quarrel with the district court's finding that his detention was lawful after he admitted to driving under a suspended license, we review only whether the initial encounter between the officers and Herrin constituted a traffic stop. If it does, Herrin contends, the officers lacked probable cause to stop his car, rendering both the gun and his confession inadmissible as the products of an unlawful seizure. Considering the evidence in the light most favorable to the government, we review the district court's findings of fact for clear error and its conclusions of law de novo. *United States v. Beauchamp*, 659 F.3d 560, 565-66 (6th Cir. 2011).

It is well settled that "[s]topping and detaining a motorist constitutes a seizure within the meaning of the Fourth Amendment even if the purpose of the stop is limited and the resulting

detention quite brief." *United States v. Bell*, 555 F.3d 535, 539 (6th Cir. 2009) (internal quotation marks omitted). But an officer only "stops" a motorist within the meaning of the Fourth Amendment when, "by means of physical force or show of authority, [he] has in some way restrained [the individual's] liberty." *Terry v. Ohio,* 392 U.S. 1, 19 n. 16 (1968). We "look to 'all of the circumstances surrounding the incident' and consider whether 'a reasonable person would have believed that he was not free to leave.'" *Beauchamp*, 659 F.3d at 566 (quoting *United States v. Mendenhall,* 446 U.S. 544, 554 (1980)). Applying the "reasonable person" test to the facts of this case, we conclude that Officer Hathaway did not seize Herrin until—following Herrin's admission to driving with a suspended license—he directed him to stand next to Officer Mitchell.

We find Herrin's argument unpersuasive because no evidence exists to support an inference that the officers restrained Herrin's liberty by any show of authority with their driving maneuvers. The officers did not activate sirens or lights, command Herrin to halt, display their weapons, or position their vehicle in a way that blocked Herrin's movement. Rather, the officers parked parallel to Herrin's already stopped vehicle and approached Herrin on foot.

Herrin points to Officer Hathaway's "not just one, but two, 180-degree U-turns" as aggressive driving that manifested the officers' intention to give chase. With the second U-turn, however, the officers lost sight of Herrin's vehicle and indeed already passed the driveway where Herrin parked his car. And though the first U-turn revealed the officers' intent to pursue Herrin, this

fact proves little: an "investigatory pursuit" does not necessarily constitute a seizure under the Fourth Amendment. *Michigan v. Chesternut*, 486 U.S. 567, 572-73 (1988).

We analogize to *Chesternut*, where police officers followed, in their police cruiser, a suspect fleeing on foot. *Id.* at 569. From their vehicle the officers watched the suspect discard a number of small packets. *Id.* at 569-70. Holding that "mere pursuit" does not necessarily constitute a seizure, the court ruled that in the absence of sirens or flashers, a command to halt, the display of weapons, or aggressive driving to impede the defendant's movement—the police officers' actions "would not have communicated to the reasonable person an attempt to capture or otherwise intrude upon [the defendant's] freedom of movement." *Id.* at 575.

Moreover, the record suggests that Herrin stopped his vehicle to abandon his gun, not to submit to the officers' authority. According to Hathaway, Herrin told the officers that "he pulled in [to the driveway] so he wouldn't get stopped with the gun in the car." Herrin points to this statement as evidence that he knew that the officers were pursuing him and that he "reasonably believed that the officers intended to stop him." The Fourth Amendment, however, asks whether the officer's conduct would lead a reasonable person to conclude that he was not free to leave. Inasmuch as the "reasonable person" test "presupposes an *innocent* person," Herrin's statement to police undermines his claim that a reasonable person would have stopped under the circumstances. *See Florida v. Bostick*, 501 U.S. 429, 438 (1991).

In short, the officers' conduct would not have conveyed to a reasonable person a command to stop. Nor was Officer Hathaway's initial interaction with Herrin in the yard so coercive as to constitute a seizure: Herrin presents no record evidence that Hathaway drew his weapon, raised his voice, or otherwise restricted Herrin's movement by imposing his authority. On this record, we agree with the district court that the encounter was consensual at its inception, *see O'Malley v. City of Flint*, 652 F.3d 662, 669 (6th Cir. 2011), and that a seizure took place only after Herrin's admission of criminal conduct.

Herrin does not challenge the propriety of the officers' decision to detain him after he admitted to driving with a suspended license. Nor does he challenge his arrest after the officers found the gun. Accordingly, we do not address the district court's conclusions on these points. Herrin claims only that his encounter with police began as an unlawful traffic stop. Because the record does not support Herrin's argument, we reject this characterization.

III.

For the above reasons, we **AFFIRM** the denial of Herrin's motion to suppress evidence.