NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0474n.06

Case No. 19-1503

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| JOSEPH BENJAMIN GALE, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | **FILED** |
| | ) | Aug 11, 2020 |
| | ) | DEBORAH S. HUNT, Clerk |
| v. | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| | ) | |
| CORRIGAN O'DONOHUE, et al., | ) | |
| | ) | |
| Defendants-Appellees. | ) | **OPINION** |
| | ) | |

BEFORE: NORRIS, DONALD, NALBANDIAN, Circuit Judges

NALBANDIAN, Circuit Judge. Joseph Benjamin Gale sued Defendants (four police officers) after an encounter with Royal Oak, Michigan police early one September 2016 morning. (R. 75-12, Video Tr., PageID 1877; R. 75-2, 911 Call Tr., PageID 1723.) Gale alleged Defendants violated his Fourth Amendment rights during their interaction and sought recompense for the violation. (R. 1, Compl., PageID 60; Appellant's Br. at 6–7.) The district court granted Defendants' summary judgment motion and rejected Gale's. (*Id.* at 56.) On appeal, Gale asks us to reverse the district court's decision and remand so he may proceed with discovery and trial. (*Id.*) We find his arguments unpersuasive and AFFIRM the district court's decision.

**I.**

In the middle of the night on a Saturday in September 2016, two police officers—Officers Phillip Klinge and Nathan Heppner—responded to a Royal Oak 911 dispatcher's request to

"check[]" the area shortly after receiving a homeowner's call about suspicious circumstances nearby. (R. 75-4, Dispatch Tr., PageID 1729.)

A female caller had reported to the dispatcher that her husband "answered the door" after "a strange man . . . all by himself" knocked on their door. (R. 75-2, 911 Call Tr., PageID 1723.) After the husband opened the door, the man "said there's a police type thing around here . . . and he wanted to help [the homeowners]." (*Id.*) The female caller explained "[i]t's not an emergency[.]" (*Id.*) But she let the dispatcher know that she was "concerned" by the man's visit because "it[ wa]s 2:30 in the morning." (*Id.*)

The dispatcher asked some other questions that the female caller could not answer, so she handed the phone to her husband who finished the call. The husband let the dispatcher know the man was about five foot ten, "thin, 25 years [old,]" and wearing "[s]treet clothes" ("[j]eans" and "a shirt"). (*Id.*) He also recalled that the man didn't smell intoxicated. "[T]hat was the weird thing[,]" given that the city hosted an arts festival that weekend and "the bars closed at 2 a.m." (*Id.*) And the husband explained that he saw the man walk away five minutes ago and go "west . . . on Dondero." (R. 75-4, Dispatch Tr., PageID 1729.)

A couple of minutes after the call, Klinge saw Gale walking alone about a quarter mile from where the 911 call originated and turned on his patrol car's lights. In response, Gale stopped and placed his hands in his pockets. Klinge approached and asked Gale, "You alright, man?" (Ex. A, Klinge In-Car Video at 1:10.) And Gale put his hands in the air.

Soon after, Heppner and Officer Michael D. Paramo—there as backup assistance—arrived on the scene. "Heppner and Paramo [then] joined in by" standing on either side of Gale "while grabbing [Gale's] arms and patting him down" without his consent. (Appellant's Br. at 3.) During the pat-down, Paramo asked Gale: "[d]o you mind if I -- do you mind if we check [for

2

identification]?" (R. 75-11, Video Tr., PageID 1870.) Gale responded "Absolutely --[.]" (*Id.*) So the officers pulled Gale's wallet from his pant pocket and examined it. They then radioed in for more information on Gale.

During the encounter, the officers also explained that they were "checking some things out" because they "got a call about somebody knocking on doors [who] matche[d] [Gale's] description." (R. 75-11, Video Tr., PageID 1870.) Gale repeatedly explained that he did not knock on anyone's door. (*Id.*) The officers then let Gale know he could put his hands down and that "[n]o one[] sa[id]" Gale knocked on some doors. (*Id.*) But they were "just asking [Gale] why [he was] out [t]here" given they received the call and Gale fit the description. (*Id.*)

In response to the officers' questions, Gale explained he was "trying to get back to [his] friend's house" at "11 and 4th" but that he "frankly di[d] not" know where he was at that moment.[1] (*Id.*) Because that destination "d[id]n't make sense" and given their interaction, the officers asked how much Gale drank that night. (*Id.*) But Gale could not answer because he "frankly [was] not sure."[2] (*Id.*)

After some more conversation, the officers twice asked whether Gale—whose phone had "r[u]n out of battery"—needed them to call Gale a cab or an Uber. (*Id.* at 1870–1871; R. 75-12, Video Tr., PageID 1877 ("We can call you a taxi. It's not a problem.").) After making the first offer, they explained they "c[ould not] have [Gale] walking around the street intoxicated." (R. 75-11, Video Tr., PageID 1870.) But Gale responded "No" and rejected that offer. (*Id.*) After that,

---

[1] In that same conversation, Gale also explained that he "d[id] not know his [friend's] address." (R. 75-11, Video Tr., PageID 1871.)

[2] In his deposition, Gale explained that he did not remember if he drank the night of the incident.

they offered again to get Gale a ride. But he could not provide the officers with any meaningful address to where they could direct that ride.

So they offered Gale a ride with them. (R. 75-11, Video Tr., PageID 1871 ("Or do you know actually where it is so we can take you there?").) Gale let them know that "[i]f you were take me to 3rd on the Rock [(a bar)], . . . ? [My friend's house] [i]s right next to that"—implying that Gale could then make it to his friend's house from that bar. (*Id.*; *see also id.* at 1872 (referring to the bar as "[T]he Rock on 3rd" as well).) After some more discussion, the officers clarified whether Gale wanted them to give him a ride. And each time Gale continued to reiterate his appreciation for the ride.

But before Paramo allowed Gale to enter his patrol car, Paramo let Gale know that Paramo would pat Gale down "for [Paramo's] own safety." (*Id.* at 1871–72 (explaining that Paramo "always" patted "[a]nyone" down before "put[ting them] in [his] car" because Paramo "do[es]n't want to let someone in [his] back seat if they got a gun on them").) And after the pat-down, Paramo drove Gale away in the backseat with Heppner following them in his own cruiser.

After turning the corner, Paramo pulled over upon Heppner's signal to do so. Heppner also pulled over and asked Paramo: "Do you want to just see if you can get a name for his friend[?]" (R. 75-11, Video Tr., PageID 1872.) So Paramo asked Gale for the friend's name and explained: "I'll see if [Heppner] can find where [the friend] lives, okay?" (*Id.*) Gale agreed—"[a]ll right, man"—and let the officers know his friend's name: "Zach." (*Id.* (referring to the friend as "Zachary" as well).) Gale even offered to find Zach's "exact address" on his phone and "tell" it to the officers if they provided him with a way to charge his phone. (*Id.*) Paramo then asked

Heppner: "You want to go check him out and see if he's good?  I'll wait right here.  I'm just going to run [him] to his buddy."[3]  (Ex. C, Paramo In-Car Video at 24:43–24:47.)

Paramo explained to Gale the reason they wanted Zach's information:  It would allow Paramo to take Gale directly to Zach rather than take Gale to The Rock on 3rd.  (R. 75-11, Video Tr., PageID 1872.)  Gale didn't seem to like that and requested instead for Paramo to take him to The Rock on 3rd.  But Paramo responded with follow-up questions on Zach's name.  Gale then repeatedly asked Paramo:  "Am I free to leave the vehicle?"  (*Id.*)  Paramo answered in the affirmative each time and confirmed multiple times to Gale that "[y]ou're not under arrest."  (*Id.*)  And Paramo explained again to Gale that the officers wanted Zach's home address so they "c[ould] take [Gale] to [Zach's] house instead of taking [Gale] to [T]he Rock on 3rd.  That's all."  (*Id.*)

Things started getting heated between Gale and Paramo, with both raising their voices at each other.  Paramo again explained the reason the officers wanted to "get [Gale] out of [t]here" and asked Gale again for Zach's information.  (R. 75-11, Video Tr., PageID 1872 (explaining the likelihood that officers would waste their time and "call on [Gale] again" if Gale remained there given the officers "had a ton of B&Es" in the area).)  Gale didn't provide it and instead offered to walk.

Rather than responding, Paramo immediately pulled away from the curb, began driving, and told Gale he'd drop Gale off at The Rock on 3rd.  (Ex. C, Paramo In-Car Video at 26:13–26:30.)  While the vehicle was moving, Gale again checked whether he was under arrest.  Again Paramo let Gale know:  "[Y]ou're not under arrest."  (*Id.* at 26:33–26:36.)

---

[3] The video transcript quotes Paramo as saying "I'm just going to run him to his buddy." (R. 75-11, Video Tr., PageID 1872.)  But the video's audio does not clearly pick up Paramo saying the word "him."  It instead picks up Paramo saying "I'm just going to run to his buddy."  (Ex. C, Paramo In-Car Video at 24:46–24:47.)  Gale on the other hand asserts that Paramo said he'd "run his buddy."  (Appellant's Br. at 3 (citing Paramo In-Car Video at 24:48).)

At that point, Gale made his first request to exit the vehicle. But Paramo responded that he'd "get[] [Gale] out of [t]here" and Gale agreed ("[a]ll right"). (R. 75-11, Video Tr., PageID 1873.) Gale then made his second request to exit the vehicle. And Gale again requested to exit the vehicle a third time. And a fourth time. During that time, Paramo continued to explain to Gale: "[Y]ou're not under arrest[,]" that Paramo was just "getting [Gale] out of that area[,]" that Gale was "allowed to leave the vehicle[,]" and that Gale was "going to leave [the vehicle]." (*Id.*) But Paramo told Gale: "[D]ude, I'm not leaving you right here" because Paramo believed he "could get in trouble" for "dropping [Gale] off on Lincoln Street when [Gale] d[id]n't know where [he was]." (*Id.*)

About ninety seconds after Gale first requested to exit the vehicle, Paramo dropped him off at a gas station. And Gale let Paramo know: "All right. I appreciate it." (*Id.*; Ex. C, Paramo In-Car Video at 28:24–28:26.)

**II.**

A month after his run-in with the police, Gale filed a citizen's complaint with the Royal Oak Police Department. In it, he explained the interaction "had a 'terrifying' effect on him." (R. 75-24, Investigation Report, PageID 1963 (quoting Gale's Citizen Complaint).) Lieutenant Van Ness met with Gale as part of Van Ness's investigation into the complaint. Van Ness recorded their two-hour meeting after Gale consented to the audio recording. After his investigation, Van Ness found the officers' conduct—including the stop and investigation—justified and appropriate. And he found Gale's complaint "exaggerated" and "suspicious[.]" (R. 75-24, Investigation Report, PageID 1969.)

So Chief Corrigan O'Donohue sent Gale a one-page letter recounting Gale's complaint and detailing Van Ness's findings. Unsatisfied with that outcome, Gale sued. In his complaint, Gale

named four officers as Defendants: Paramo, Heppner, Klinge, and O'Donohue. He raised several claims under 42 U.S.C. § 1983 including a civil conspiracy claim and a municipal liability claim. Gale also raised § 1983 claims alleging the officers who interacted with him that night violated his Fourth Amendment rights by stopping Gale on the sidewalk and patting him down (the first stop and frisk), by unconstitutionally seizing and searching his wallet, frisking Gale before he entered Paramo's car (the second frisk), and by providing Gale a ride in Paramo's patrol car. And he raised various state-law claims. Gale sought injunctive relief and damages for the various injuries he alleged, including the "injury to his feelings[.]" (R. 1, Compl., PageID 58–60.)

During discovery, Gale deposed Heppner, Paramo, and O'Donohue. Gale also sent Defendants interrogatories and requests for production. Defendants sent Gale interrogatories and requests for production as well. And Defendants deposed Gale.

Unsatisfied with each other's discovery responses, each party moved to compel more discovery. Gale alleged Defendants provided "meaningless and evasive" responses to Gale's interrogatories and "resort[ed] to 'boilerplate' objections in response to almost every discovery request." (R. 42, Gale's Mot. to Compel, PageID 729, 733–34.) He asked the court to strike Defendants' objections to his interrogatories, to strike Defendants' objections to his requests for production, and to require Defendants respond in good faith to both. And he asked the court to find O'Donohue's interrogatory responses inconsistent with the capacity in which Gale sued him.

In their motion, Defendants alleged Gale failed to timely provide his initial disclosures as required by Federal Rule of Civil Procedure 26(a)(1)(C). They also asked the court to require Gale to respond fully and completely to their discovery requests—including their request for Zach's last name and contact information.

7

After a hearing, the magistrate judge granted in part Gale's motion to compel. She requested O'Donohue review his discovery responses and supplement his responses to make clear whether he answered in his individual capacity. She also required him to supplement his responses to include information responsive to Gale's "official capacity claims against [O'Donohue]." (R. 66, Magistrate Disc. Order.)

But she also denied Gale's motion in part. She found that Defendants did respond with many boilerplate objections. She could not, however, "discern what, if any, deficiencies actually existed" because Gale "had not specified exact deficiencies." (R. 74, District Ct. Order, PageID 1665.) And she observed that "Defendants provided answers subject to their objections and supplemented their responses to reflect whether they had withheld information or documents on the basis of their objections." (*Id.* at 1665–66.) For those reasons, she found "no specific relief available, except to remind Defendants that they have an ongoing duty to supplement their responses." (*Id.* at 1665.)

The magistrate judge also granted Defendants' motion to compel. She ordered Gale to "make reasonable efforts to obtain and provide to [D]efendants contact information for" Zach. (R. 66, Magistrate Disc. Order.) She defined those "reasonable efforts" as "including but not limited to" finding the last known address Gale had for Zach. (*Id.*) She also ordered Gale to respond in writing to three of Defendants' discovery requests.

Gale objected to the magistrate judge's order. He argued the magistrate judge inappropriately "allow[ed] Defendants to assert improper boilerplate objections" to Gale's interrogatories. (R. 67, Gale Objs., PageID 1426.) The district court agreed with the magistrate judge that Defendants "overstuffed" their responses with "boilerplate objections that do not specify how exactly" they found Gale's discovery request "deficient." (R. 74, District Ct. Order, PageID

1665.) But it also agreed with the magistrate judge that Defendants cured deficiencies by supplementing their answers and producing documents. Thus, because the district court could not find the magistrate judge's order contrary to law "[w]ithout a more detailed showing of how a specific boilerplate objection is objectionable," it overruled Gale's objections. (*Id.* at 1666.)

The parties then moved for summary judgment.[4] Defendants urged the court to grant its motion for all Gale's claims on qualified immunity and other grounds. Gale asked the court to grant him summary judgment on his Fourth Amendment claims and on his municipal liability claim. The court reviewed the parties' motions and found that

> (1) the officers had reasonable suspicion to stop Gale, (2) the officers had reasonable suspicion to frisk Gale, (3) Gale consented to the removal of his wallet, (4) Gale consented to the ride, (5) Gale consented to the second frisk before entering Paramo's car, and (6) Paramo did not violate a clearly established constitutional right by not immediately letting Gale out of the car.

*Gale v. O'Donohue*, No. 17-12172, 2019 WL 1897130, at *12 (E.D. Mich. Apr. 29, 2019). For those reasons, it found Paramo "is entitled to qualified immunity for his conduct during the ride" and granted him summary judgment on that claim. *Id.* It also granted Defendants summary judgment on those claims and concluded that Gale's conspiracy and municipal liability claims failed. *Id.* at *12–13. Finally, the district court declined to exercise its supplemental jurisdiction over Gale's state-law claims because it disposed of all his federal claims. *Id.* at *13. Gale appeals.

## III.

Gale first asks us to reverse the district court's order overruling his objections to the magistrate judge's discovery order for two reasons: (1) the district court erred in failing to wait

---

[4] Gale also moved to preliminarily enjoin practices and policies of the Royal Oak Police Department that Gale alleges are unconstitutional. The district court denied this motion. Between the district court's discovery order and the parties' summary judgment motions, Gale appealed the district court's denial. And we affirmed the district court's decision. *See Gale v. O'Donohue*, 751 F. App'x 876 (6th Cir. 2018).

for Defendants to respond to Gale's objections before overruling his objections and (2) Defendants' use of boilerplate language in their discovery responses renders them insufficient. (Appellant's Br. at 53–56.) We review the trial court's decision for abuse of discretion. *Himes v. United States*, 645 F.3d 771, 782 (6th Cir. 2011) (citing *Dortch v. Fowler*, 588 F.3d 396, 400 (6th Cir. 2009)).

Gale first urges us to find the district court's decision contrary to law because the district court did not wait for Defendants' response to Gale's objections before overruling them. Gale relies on *Bobo v. United Parcel Serv., Inc.*, 665 F.3d 741, 753 (6th Cir. 2012), for his position but that case is inapposite. *Bobo* involved a court discovery order that the plaintiff had filed objections to. Instead of ruling on the objections, however, the trial court granted summary judgment to the defendant. *Id.* This court determined that the trial court should have ruled on plaintiff's objections, that the discovery order was "contrary to law" in any event, and that summary judgment was inappropriate. *Id.* at 753. Here, the district court timely addressed Gale's objections to the discovery order before granting judgment. And, of course, Defendants responded to his motion to compel.

Gale also does not point to any on-point legal authority holding that a district court can only rule on these types of objections after the opposing party responds to them. And statutory authority shows otherwise. *See* 28 U.S.C. § 636(b)(1)(A), (C) (discussing objections and a district court's role in them without mentioning responses). The Federal Rules of Civil Procedure do as well; Rule 72(a) lays out the district court's obligations after a party objects to a discovery order without mentioning any obligation to respond to objections. *See* Fed. R. Civ. P. 72(a) ("A party may serve and file objections to the order . . . . [And t]he district judge in the case must consider

timely objections and modify or set aside any part of the order that is clearly erroneous or is contrary to law.")

Second, Gale again complains about the boilerplate language Defendants used in their objections to his interrogatories. Gale is correct that Defendants used boilerplate language in their discovery responses, which both the magistrate judge and the district court acknowledged. Even so, the judges also explained that—"[w]ithout a more detailed showing" by Gale—neither could find deficiencies resulting from that language. (R. 74, District Ct. Order, PageID 1666.)

On appeal, Gale still fails to explain the information he believes Defendants' withheld from him arguing only that Defendants' withholding of information harmed him because "he was never even made aware of the factual basis of the 'reasonable suspicion' or the 'consent' found by the district court" in its summary judgment order. (Appellant's Br. at 55.) But Gale *personally* took Heppner, Paramo, and O'Donohue's depositions *after* Gale moved to compel discovery because he felt Defendants' boilerplate objections prejudiced him. (*Compare* R. 42, Gale's Mot. to Compel (July 18, 2018), *with* R. 75-8, Heppner Dep. (August 23, 2018), *and* R. 75-9, Paramo Dep. (August 20, 2018), *and* R. 75-10, O'Donohue Dep. (August 24, 2018).) And the magistrate issued its discovery order almost two months after Gale filed his motion to compel. (R. 66, Magistrate Disc. Order (September 5, 2018).) So Gale had a chance to supplement Defendants' responses to his interrogatories during that time—both during the depositions he took and otherwise before discovery closed.

And the district court based its finding of reasonable suspicion and consent on information available to Gale regardless of the language in Defendants' objections. The district court found that Defendants had reasonable suspicion to stop and frisk Gale and did not otherwise violate the Fourth Amendment based on information found in Defendants' depositions and other discovery

11

Defendants produced. *Gale*, 2019 WL 1897130, at *5–12. For example, the district court found Gale consented to the wallet removal and search given, at least in part, the exchange between the two documented on an in-car video. *Id.* at *8 n.7. The court did not specify *which* video it referenced. But Defendants made all videos connected with this case available to Gale in response to a FOIA request approximately *two years* before he moved to compel discovery—plenty of time for Gale to familiarize himself with the videos before the district court's decision. (*See* R. 75-33, FOIA Req. Resp., PageID 2009 (responding to the September 6, 2016 request two days later on September 8, 2016).)

For those reasons, the district court did not abuse its discretion in rejecting Gale's objections to the magistrate's discovery order.[5]

## IV.

The rest of Gale's appeal asks us to reverse the district court's decision granting Defendants summary judgment on all his claims and denying Gale's summary judgment motion. To determine whether the district court appropriately granted Defendants summary judgment, we review each of Gale's federal claims other than his civil conspiracy claim. Gale failed to raise that claim in his opening brief to this court. So we need not address it. *See Kuhn v. Washtenaw County*, 709 F.3d 612, 624 (6th Cir. 2013).

---

[5] By no means do we (nor any of the courts in this case) condone parties' use of boilerplate objections during discovery in lieu of specific and individualized objections as set out in the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 33(b)(4) and 34(b)(2)(B), (C). This is a problem that has been discussed at length elsewhere. *See, e.g.*, *Wesley Corp. v. Zoom T.V. Prod., LLC*, No. 17-10021, 2018 WL 372700, at *4 (E.D. Mich. Jan. 11, 2018); *Liguria Foods, Inc. v. Griffith Labs., Inc.*, 320 F.R.D. 168 (N.D. Iowa 2017); Matthew L. Jarvey, *Boilerplate Discovery Objections: How They Are Used, Why They Are Wrong, and What We Can Do About Them*, 61 Drake L. Rev. 913 (2013). But Gale's argument fails *despite* Defendants' improper use of boilerplate objections; Gale simply has no claim in the context of this case given Defendants' compliance otherwise and Gale's own conduct.

This court reviews de novo the district court's grant of summary judgment. *Luna v. Bell*, 887 F.3d 290, 297 (6th Cir. 2018). We also draw all reasonable inferences in favor of the nonmovant. *Nickels v. Grand Trunk W. R.R.*, 560 F.3d 426, 429 (6th Cir. 2009) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact requires more than "a scintilla of evidence" to allow the factfinder to reasonably find in the movant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). But nonmoving parties cannot use "speculation, conjecture, or fantasy" to avoid summary judgment. *K.V.G. Props., Inc. v. Westfield Ins. Co.*, 900 F.3d 818, 823 (6th Cir. 2018) (quoting *Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir. 2004)). And "[c]onclusory statements unadorned with supporting facts are insufficient to establish a factual dispute that will defeat summary judgment." *Alexander v. CareSource*, 576 F.3d 551, 560 (6th Cir. 2009) (citing *Lewis*, 355 F.3d at 533; *Doren v. Battle Creek Health Sys.*, 187 F.3d 595, 598–99 (6th Cir. 1999)).

Summary judgment is also appropriate on qualified immunity grounds. *See Simmonds v. Genesee County*, 682 F.3d 438, 446 (6th Cir. 2012). "Once a defendant raises qualified immunity, 'the burden is on the plaintiff to demonstrate that the official[ is] not entitled to qualified immunity[.]'" *Id.* at 444 (first alteration in the original) (quoting *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006)). To do so, the "plaintiff 'must present evidence sufficient to create a genuine issue as to whether the defendant committed the acts that violated the law'" and must "allege[] 'facts sufficient to indicate that the [defendant's] act in question violated clearly established law at the time the act was committed[.]'" *Id.* (quoting *Adams v. Metiva*, 31 F.3d 375, 386 (6th Cir. 1994); *Russo v. City of Cincinnati*, 953 F.2d 1036, 1043 (6th Cir. 1992)); *see also*

*Pearson v. Callahan*, 555 U.S. 223, 232 (2009). To qualify as clearly established law, "at the time of the officer's conduct, the law [must have been] 'sufficiently clear that every reasonable official would understand that what he is doing' is unlawful." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (internal quotation marks omitted) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). But we may resolve whether a plaintiff has met those requirements in any order. *Pearson*, 555 U.S. at 236. And "[w]e review the district court's grant of summary judgment on the grounds of qualified immunity de novo." *Simmonds*, 682 F.3d at 444.

## A.

First, Gale argues that the district court inappropriately granted Defendants' summary judgment on Gale's Fourth Amendment claims. Gale claims that Klinge, Heppner, and Paramo violated his Fourth Amendment rights by (1) stopping him, (2) frisking him, (3) removing his wallet, (4) forcing him into riding in Paramo's car, (5) frisking him again before he got into Paramo's car, and (6) continuing to drive after he requested to exit Paramo's car. We address each argument in turn.

### 1. The Stop

All parties agree the officers made an investigatory stop that night. But they disagree on whether Defendants had the reasonable suspicion required to stop Gale.

Officers may make *Terry* stops to "briefly detain a person for investigative purposes" so long as the stop is "reasonable." *United States v. Young*, 707 F.3d 598, 603 (6th Cir. 2012) (quoting *Terry v. Ohio*, 392 U.S. 1, 20–22 (1968)). To do so, the officer must have "some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." *United States v. Cortez*, 449 U.S. 411, 417 (1981); *United States v. Sokolow*, 490 U.S. 1, 9 (1989). Or officers may believe the person stopped "was involved in a completed crime." *United States v.*

14

*Hensley*, 469 U.S. 221, 227 (1985); *see also United States v. Place*, 462 U.S. 696, 702 (1983) (Officers may stop individuals "when the officer has reasonable, articulable suspicion that the person *has been*, is, or is about to be engaged in criminal activity." (emphasis added)).

Reasonable suspicion requires more than a generalized hunch. It requires that officers have "'specific and articulable facts [that] gave rise to reasonable suspicion' of criminal activity." *Young*, 505 F.3d at 603 (quoting *United States v. Davis*, 430 F.3d 345, 354 (6th Cir. 2005)); *United States v. Harris*, 192 F.3d 580, 584 (6th Cir. 1999) (explaining that an officer may stop a suspect when she "reasonably concludes that criminal activity may be afoot"). But the "suspicious behavior need only be recognizable by one 'versed in the field of law enforcement.'" *United States v. Foster*, 376 F.3d 577, 585 (6th Cir. 2004) (quoting *United States v. Knox*, 839 F.2d 285, 290 (6th Cir. 1988)). And reasonable suspicion for a *Terry* stop requires "considerably less than proof of wrongdoing by a preponderance of the evidence." *Id.* (quoting *Sokolow*, 490 U.S. at 7).

We look at the totality of the circumstances when the *Terry* stop began to evaluate whether the officer had reasonable suspicion for the stop. *Young*, 707 F.3d at 603. Considerations relevant to our evaluation include 911 calls—anonymous or not. *See Navarette v. California*, 572 U.S. 393 (2014) (anonymous); *Robinson v. Howes*, 663 F.3d 819 (6th Cir. 2011) (not completely anonymous). They also include where and when the stop occurred. *United States v. Smith*, 594 F.3d 530, 541–42 (6th Cir. 2010). And "conduct . . . consistent with innocent behavior can [] provide reasonable suspicion[.]" *Carter v. Hamaoui*, 699 F. App'x 519, 528 (6th Cir. 2017) (citing *Sokolow*, 490 U.S. at 9). Those considerations convince us that the officers had reasonable suspicion to stop Gale.

The 911 call received earlier that night supports our decision. Anonymous or not, 911 calls may contribute to an officer's reasonable suspicion. But the Supreme Court has cautioned that "an

anonymous tipster's veracity is by hypothesis largely unknown, and unknowable." *Navarette*, 572 U.S. at 397 (internal quotation marks omitted) (quoting *Alabama v. White*, 496 U.S. 325, 329 (1990)). Only "under appropriate circumstances" can anonymous tips "demonstrate 'sufficient indicia of reliability to provide reasonable suspicion to make [an] investigatory stop.'" *Id.* (alteration in original) (quoting *White*, 496 U.S. at 327). And "a reliable tip will justify an investigative stop only if it creates reasonable suspicion that 'criminal activity may be afoot' . . . [or if it] create[s] reasonable suspicion of an ongoing crime[.]" *Id.* at 401 (quoting *Terry*, 392 U.S. at 30).

We find the 911 call informing the officers' *Terry* stop reliable for four reasons. First, the call was not completely anonymous. Although neither caller gave a name, the female caller gave her home address. By connecting themselves to the address reported, the callers provided at least the "minimal" "identifying information" we consider enough to distinguish a tip from a "completely unidentifiable tipster[.]" *Robinson*, 663 F.3d at 829 (finding an address the caller provided without a "claim to live at the reported address or [an] assert[ion] [of] any other connection to it" sufficient to classify a call as "not completely anonymous"). So we need not view this tip with the same level of skepticism the we must view completely anonymous tips. *See, e.g.*, *Navarette*, 572 U.S. at 398–99 (assuming the 911 call alleging only that "a specific vehicle" engaging in "dangerous driving" was anonymous); *Florida v. J.L.*, 529 U.S 266, 272–74 (2000) (alleging only the potential suspects' physical appearances and location); *White*, 496 U.S. at 332 (providing only the suspect's identifying information and her alleged future criminal activity); *see also United States v. Farrington*, 795 F. App'x 404, 408–09 (6th Cir. 2019) (explaining that anonymous tip cases "require considerably more facts and support from the informant for the officers to develop reasonable suspicion").

Second, the 911 call also provided the officers with "contemporaneous" and "[f]irsthand knowledge[.]" *Robinson*, 663 F.3d at 829; *see Navarette*, 572 U.S. at 399–400 (explaining that "statements about an event [] made soon after perceiving that event[,]" like statements made under the "present sense impression[]" hearsay exception, "are especially trustworthy because 'substantial contemporaneity of event and statement negate the likelihood of deliberate or conscious misrepresentation'" (quoting Fed. Rule Evid. 803(1) advisory committee's note)). The callers informed the 911 dispatcher of the strange man's visit around five minutes after it happened. The husband directly interacted with the man and detailed that interaction to his wife who started the call. The husband also gave his firsthand account to the dispatcher directly.

Gale argues that the first half of the call between the wife and the dispatcher was not made with firsthand knowledge. (Appellant's Br. at 15.) He also claims that the husband only vaguely described the strange man and the situation to the dispatcher directly. (*Id.*) We agree that the 911 call implied the female caller did not interact with the strange man who knocked on their door. That does not, however, render the information she relayed unreliable. She might not have seen the strange man or interacted with him. But the information she relayed came from someone who very recently did, analogous to information found in present sense impression statements.

We have found the type of contemporaneous statement made here—by a tipster who received that information from a third-party eyewitness with the tipster at the time of the call— weighs in favor of a 911 call's reliability. *See Farrington*, 795 F. App'x at 409. In *Farrington*, Joseph Clark called the police and explained that Traevon Atkins reported to him an individual Atkins had spoken to on the premises (Tavares Farrington) who may possess a firearm. *Id.* at 405. Clark explained that Atkins "was currently with [Clark] in the human resources office." *Id.* During the call, Clark also "relayed Atkins'[s] responses [on] Farrington's race, height, age, attire, and

17

distinguishing features[.]" *Id.* "Neither . . . were able to provide the dispatcher with Farrington's name." *Id.*

When the police arrived, Clark spoke to them and "an unnamed" individual provided them Farrington's name and other identifying details. *Id.* at 406. During that on-site interaction, "Atkins was seated next to the officers in the office" but the police "did not ask [Atkins] any questions or attempt to confirm [with Atkins] any of the information [Clark or the dispatcher] provided[.]" *Id.* In fact, other than making a joke, Atkins did not speak to the police at all. *Id.* (explaining that Atkins "jokingly stated, 'I didn't do nothing I promise'"); *id.* at 409 (explaining that the police "never asked any questions of Atkins"). And at that time, Atkins "reek[ed] of weed" but did not seem impaired. *Id.* at 406. But we found the information Clark relayed "reasonably reliable" given Atkins "was with [Clark] during the call" and given the police "were [also] in [Atkins's] presence" when they spoke with Clark in person. *Id.* at 409.

In Gale's case, the officers never verified the callers' identities in person. But the dispatcher acquired at least some identifying information that could help them easily identify the callers. The 911 call also contained a contemporaneous statement like the one in *Farrington*— made by a tipster who received that information from a third-party eyewitness with the tipster at the time of the call. So we find the information communicated from the wife to the dispatcher sufficiently connected to firsthand knowledge to support the call's reliability. Not to mention, the eyewitness here (the husband), unlike Atkins, even spoke to the dispatcher and answered the dispatcher's questions.

Third, "[t]here [wa]s also reason to think that the 911 caller in this case was telling the truth." *Navarette*, 572 U.S. at 399. On the night of the call, Gale fit the description of the strange man in the 911 call. (*Compare* R. 75-6, Gale Dep., PageID 1736 (describing Gale as six feet tall,

around 180 pounds, 28 years old, and white at the time of the stop), *with* R. 75-2, 911 Call Tr., PageID 1723 (describing the "strange man" as "[a]bout 5-10[,]" "thin, . . . about 25 years old[,]" and white).) Gale also wore similar clothing reportedly worn by the strange man.[6] (*Compare* R. 75-4, Dispatch Tr., PageID 1729 (advising officers the strange man wore a "jeans and a T-shirt"), *and id.* (telling officers the suspect wore a "white shirt" and "blue jeans"), *with* Ex. A, Klinge In-Car Video at 00:56–01:06.) And the officers found *only* Gale on foot in close proximity—geographically and temporally—to where the callers reportedly last observed the "strange man" at a time when few people were walking around. (R. 75-5, Map, PageID 1732 (depicting where officers found Gale as a four-minute walk and 0.2 miles from the callers' location); R. 75-12, Video Tr., PageID 1878 (explaining that Gale was "the only guy that *four* officers ran into" in that area (emphasis added)).)

Last, the callers used the 911 emergency system—"[a]nother indicator of veracity[.]" *Navarette*, 572 U.S. at 400. "A 911 call has some features that allow for identifying and tracing callers, . . . provid[ing] some safeguards against making false reports with immunity." *Id.* The ability to record 911 calls—like the recording here—"provides victims with an opportunity to identify the false tipster's voice and subject him to prosecution[.]" *Id.* And as early as 2001, "carriers have been required to identify the caller's geographic location with increasing specificity." *Id.* at 401. Given those "technological and regulatory developments, . . . a false tipster would [likely] think twice before using such a system." *Id.* So the officers could rely on

---

[6] Gale asserted in his deposition that he wore "a *pink* button-down collared shirt" and "blue jeans" that night. (R. 75-6, Gale Dep., PageID 1744 (emphasis added).) The in-car video, however, shows Gale wearing a white shirt. (*See* Ex. A, Klinge In-Car Video at 00:55–1:00; Ex. C, Paramo In-Car Video at 22:30–22:47.) "[T]here are no allegations or indications that this videotape was doctored or altered in any way, nor any contention that what it depicts differs from what actually happened." *Scott v. Harris*, 550 U.S 372, 378 (2007). And when the record "blatantly contradict[s]" one of the parties' asserted facts "so that no reasonable jury could believe it," we need not adopt that asserted fact to render our summary judgment decision. *Id.* at 380.

the callers' use of the 911 system as one factor in favor of the calls' reliability, "justif[ying]" the officers' "reliance on the information reported in the 911 call." *Id.*

Satisfied with the call's reliability, we also find that the call—taken together with the circumstances here—provided the officers reasonable suspicion for the stop. Specifically, these factors convince us that the officers had reasonable suspicion at the time of the stop that Gale had attempted to break and enter at least one home that night.[7]

The officers' experience taught them that some criminals engage in the conduct reported on the 911 call "when breaking into houses." The call and the stop also occurred in the early hours

---

[7] Gale argues that the record does not support finding the officers suspected him of casing homes for burglaries and urges us to find that the "record [in fact] directly contradicts such a finding." (Appellant's Br. at 22.) To support his position, Gale quotes Heppner responding "No" to Gale asking whether Heppner had "reasonable suspicion of a B&E that night[.]" (*Id.* at 25–26 (emphasis omitted) (quoting R. 75-8, Heppner Dep., PageID 1787).)

That testimony does not, however, contradict us finding that the officers had reasonable suspicion that Gale *attempted* to break and enter homes that night—in other words, casing homes for burglaries. In fact, Heppner testifies to this point in the passage Gale quotes from Heppner's deposition. (*See id.* at 25 ("[T]he knocking on the door . . . is one of the things that some criminals will do in neighborhoods when breaking into houses.").) The passage Gale quotes from Paramo's deposition to support his position also falls short. (*Id.* at 26–27.) And we find ample support in the record for the officers' reasonable suspicion of Gale's involvement in an attempted breaking and entering. *See infra*, at 21–23. So we reject Gale's position.

Gale also urges us to find that the officers could not stop him even if they had reasonable suspicion of his involvement in a breaking and entering. (Appellant's Br. at 28.) Gale cites Mich. Comp. Laws § 500.115(1) to support his assertion that breaking and entering under Michigan law is merely a misdemeanor. He also asserts that state law only permits officers to arrest someone without a warrant if they are guilty of a misdemeanor committed in an officer's presence. For those reasons, Gale concludes that the "investigation into this misdemeanor offense could serve no constitutional justification" given that the purpose of a *Terry* stop is to attempt to develop probable cause to arrest. (*Id.* at 29.)

But section 500.115 has nothing to do with breaking and entering. Section 750.110 does. It defines breaking and entering as "a *felony* punishable by imprisonment for not more than 10 years." § 750.110(1) (emphasis added). We have also already found an officer's reasonable suspicion of breaking and entering under section 750.110 sufficient to justify *both* a *Terry* stop and frisk. *United States v. McMullin*, 739 F.3d 943, 947 (6th Cir. 2014). And in any event, this court has recently found that the Fourth Amendment does not per se prohibit investigatory stops prompted by completed misdemeanors. *See United States v. Jones*, 953 F.3d 433 (6th Cir. 2020).

of the morning—something the officers explained also contributed to their reasonable suspicion. And the officers found *only* Gale—someone fitting the call's description— on foot and near the call (both geographically and temporally). *Supra*, at 20.

The area's crime characteristics also contributed to the officers' reasonable suspicion. *See Smith*, 594 F.3d at 541–42. And the officers provided sworn testimony that, at the time of their interaction with Gale, "a lot of B&Es" occurred in the area where the 911 call originated. (R. 75-9, Paramo Dep., PageID 1802; *see also* R. 75-10, O'Donohue Dep., PageID 1850.) Gale argues his evidence contradicts the officers' sworn testimony on the area's crime characteristics. He presents "approximately" three months of "Royal Oak Police bulletins" that he argues "demonstrated [] there was *no criminality* in the 'area'" around the time the officers stopped him. (Appellant's Br. at 30 (quoting R. 83-2, Royal Oak Police Bulletins).) But those bulletins only reveal information on the area's crime characteristics for one week (late July 2016 through early August 2016) a month before the incident involving Gale and for about a month after the incident (late September 2016 to late October 2016). That information casts little to no doubt on the officers' testimony—that they had experience with "a lot of B&Es" in that area over a greater time than the Bulletins cover.

So the officers had reasonable suspicion to stop Gale. That stop did not violate Gale's Fourth Amendment rights and the district court appropriately granted Defendants summary judgment on this claim.

**2. First Frisk**

Police officers must have justification separate from the justification permitting a *Terry* stop to frisk suspects during that stop. *See United States v. McMullin*, 739 F.3d 943, 945–46 (6th Cir. 2014). "[T]o proceed from a stop to a frisk, the police officer must reasonably suspect that

21

the person stopped is armed and dangerous." *Id.* at 946. But an officer's reasonable suspicion can justify both stopping *and* frisking the suspect. *Id.* For example, the facts giving rise to a reasonable suspicion that the suspect attempted to break and enter homes (the justification for the *Terry* stop) may also give rise to a police officer's reasonable suspicion that the suspect is armed and dangerous (the justification for the frisk).

We find Heppner and Paramo had reasonable suspicion to conduct the initial pat-down. Both had reasonable suspicion of Gale's involvement in an attempted breaking and entering earlier that night. Based on that understanding, they both could have "reasonably suspect[ed]" Gale "[wa]s armed and dangerous." *See id.* at 947 (finding reasonable suspicion of breaking-and-entering under Michigan law sufficient to reasonably suspect that the suspect was armed and dangerous and that subsequent circumstances did not "negat[e] the officer's ability to lawfully" conduct the frisk). And both testified to that as their motivation for the initial pat-down. (*See* R. 75-8, Heppner Dep., PageID 1782 (explaining he "patted down [Gale's] right side for any weapons"); R. 75-9, Paramo Dep., PageID 1814 (explaining he believed Gale "was armed and dangerous").)

That Gale had his hands in the air when Paramo first saw him and approached also contributed to Paramo's reasonable suspicion that Gale might be armed and dangerous. (*Id.* at 1814.) In Paramo's experience, when someone does that, "they are trying to separate their hands from something that could be a threat to [an officer.]" (*Id.* at 1812.) It also "indicat[ed] to [Paramo] that there[ wa]s something within [Gale's] reach"—something "that's still dangerous"— that Gale could reach "quicker than [Paramo] could react." (*Id.* at 1813.)

Thus, we find the officers had reasonable suspicion justifying the initial pat-down.

**3. Wallet Removal**

The Fourth Amendment permits warrantless searches and seizures where the suspect consents. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). The suspect must "voluntarily give[]" consent; it cannot result from "duress or coercion, express or implied." *Id.* at 248–49. Consent-based searches also "require[] more than mere expression of approval" and more than "futility and acquiescence[.]" *United States v. Cochrane*, 702 F.3d 334, 343 (6th Cir. 2012) (quoting *United States v. Canipe*, 569 F.3d 597, 603 (6th Cir. 2009)) (citing *United States v. Worley*, 193 F.3d 380, 386 (6th Cir. 1999)). But we do not require a "talismanic phrase" to find consent. *Harajli v. Huron Township*, 365 F.3d 501, 506 (6th Cir. 2004).

"Voluntariness is a question of fact to be determined from all the circumstances[.]" *Bustamonte*, 412 U.S. at 248–49. "[D]etermination of consent . . . must [also] 'be judged against an objective standard[.]'" *Illinois v. Rodriguez*, 497 U.S. 177, 188 (1990) (quoting *Terry*, 392 U.S. at 21–22); *see also United States v. Carter*, 378 F.3d 584, 588 (6th Cir. 2004) (en banc) (explaining that "the police are not held to a higher standard . . . than an ordinary person" when considering whether the individual consented). For that determination, we ask: Would "an ordinary person" have understood the person to have voluntarily consented from "all the circumstances[?]" *Carter*, 378 F.3d at 587–88.

Factors we examine include schooling or intelligence, the individual's youth, the detention's length, "the repeated and prolonged nature of the questioning," and "the use of physical punishment such as the deprivation of food or sleep." *United States v. Crowder*, 62 F.3d 782, 786–87 (6th Cir. 1995) (quoting *Bustamonte*, 412 U.S. at 226). We may also consider whether officers warned the individual. But the individual need not have had "knowledge of the right to refuse consent[.]" *Bustamonte*, 412 U.S. at 232. "And, this consent is not vitiated merely because the

valid suspicion of wrongdoing for which an individual has been stopped proves to be unfounded or does not result in prosecution and the individual is free to go before being asked" to consent to a search. *United States v. Erwin*, 155 F.3d 818, 823 (6th Cir. 1998) (en banc).

Given the totality of the undisputed facts, it's clear that Gale consented to the officers' search and seizure of his wallet. Gale said nothing but "[a]bsolutely" after the officers asked Gale whether he minded them checking for his identification. (R. 75-12, Video Tr., PageID 1876.) And he did so without raising his voice and with a "cooperative" demeanor. *United States v. McCauley*, 548 F.3d 440, 447 (6th Cir. 2008); *see United States v. Herrera*, 733 F. App'x 821, 825 (6th Cir. 2018) (factoring in a defendant's "tone of voice" to "convey[] voluntary consent to [a] search, rather than mere acquiescence"). During the search and seizure of his wallet, Gale's demeanor also stayed the same; he never indicated—either verbally or physically—that he objected to the officers' actions. Gale's *entire* interaction with the officers that night—including the stop, the frisk, the search and seizure of his wallet, the second frisk, and the time in Paramo's car—lasted little more than ten minutes. At the time of the stop, Gale was also 28 years old and showed no indications that he lacked the schooling or knowledge to consent.[8]

The officers also did not use any "physical punishment" to coerce Gale into consenting to the wallet seizure and search. They did, however, receive Gale's verbal consent during the valid *Terry* frisk. But consent given during a valid *Terry* stop, physical seizure, or arrest will not

---

[8] In fact, despite no knowledge prerequisite to find consent, Gale likely did have relevant and sufficient schooling to know he had a right to refuse the search. Gale even testified that he used his legal education and knowledge to tailor his answers to the officers. (*See* R. 75-6, Gale Dep., PageID 1762 (explaining that he "intentionally" let Defendants know he could not recall the amount he had to drink that night given his legal knowledge and background).)

necessarily defeat the voluntariness of consent.[9] *See United States v. Watson*, 423 U.S. 411, 424–25 (1976) (arrest); *Crowder*, 62 F.3d at 788 (6th Cir. 1995) (arrested and handcuffed); *United States v. Johnson*, 23 F.3d 409, at *5 (6th Cir. 1994) (per curiam) (table) ("[A] defendant's voluntary consent to a search is not invalid solely because the consent was given during a justified Terry stop." (citing *Knox*, 839 F.2d at 294 n.4)).

Gale, however, tries to create a factual dispute about consent with two arguments. He argues that his response suggested he did *not* consent to the search and seizure of his wallet. Gale testified he "was going to say absolutely not" because he did not want to refuse the officers' request—"mean[ing] that [he] d[id] not mind." (R. 75-6, Gale Dep., PageID 1746.) But the officers cut him off. So they only heard Gale say "absolutely"—a statement Gale argues conveyed he did mind and that he did not give consent. Gale also argues that he did not consent to the search

---

[9] Gale argues that *United States v. Beauchamp*, 659 F.3d 560, 572 (6th Cir. 2011) supports us finding that the officers did not have Gale's consent to conduct the search and seizure of his wallet. (Appellant's Br. 36–37.) It does not.

The police in *Beauchamp* had no reasonable suspicion to detain Beauchamp. *Id.* at 571. But they "repeatedly prevented [Beauchamp] from exercising his right to walk away" and stopped Beauchamp *illegally*. *Id.* at 571, 573. They then illegally frisked Beauchamp. *Id.* at 565. *Only after that* did they "ask[] Beauchamp if [they] could conduct a search" of Beauchamp's person and did Beauchamp "sa[y] yes." *Id.* at 565.

So we found Beauchamp did not voluntarily consent and instead characterized his position as one of a "scared, defenseless man" coerced by the police. *Id.* at 572. The illegal frisk weighed heavily on our reasoning. *Id.* (finding it "important[]" that "Beauchamp gave his response immediately after Officer Fain had placed his hands on Beauchamp's body to conduct the frisk"). As did the likelihood that "[a] suspect's knowledge of a prior illegal search can [] give rise to a sense of futility" and "easily" lead to "tremendous pressure on [the suspect] to acquiesce." *Id.* at 572; *see also Cochrane*, 702 F.3d at 343 (citing *Beauchamp* for the proposition that "consent [i]s not voluntary" where a "series" of illegal conduct "culminated in the consent to search"). And we found that *despite* the lack of flashing lights or drawn weapons.

Our reasoning and decision in *Beauchamp* do not require us to similarly find Gale "scared[ and] defenseless" and unable to consent at the time of the wallet search. In fact, given the different circumstances in Gale's case, we find the opposite. *Supra*, at 24. *Beauchamp* also does not compel us to conclude that a *legal* stop and frisk as well as flashing lights will per se defeat consent. And we find those factors do not do so here.

and seizure of his wallet because the officers asked him for consent "*as* they were removing [his wallet]." (*Id.* (emphasis added).)

Gale's arguments fail. They do "not defeat [Defendants'] otherwise properly supported motion for summary judgment[.]" *Anderson*, 477 U.S. at 247–48.

Gale's linguistic argument boils down to whether Gale's word choice in this case, without context, creates a dispute on his consent to the search and seizure. We find it does not. It may be that, without context, an affirmative answer—*e.g.* "absolutely"—in response to the type of question posed here "is ambiguous[.]" *United States v. Price*, 54 F.3d 342, 346 (7th Cir. 1995) (explaining that "[s]ure" in response to "[d]o you mind[?]" is "capable of being interpreted as either 'Go ahead' or 'No way'"). An ordinary person could understand Gale's response "absolutely" to mean "absolutely [I mind]" and as a refusal to consent. But an ordinary person could *also* interpret Gale's response "absolutely" to mean "absolutely [you may search my wallet]" or "absolutely [not, I *don't* mind]" and as consent.

But consent is by nature a totality-of-the-circumstances inquiry. *Schneckloth*, 412 U.S. at 233. And in context—especially given Gale's cooperative tone and demeanor on top of his lack of protest in response to the officers' actions—an ordinary officer or person would understand Gale consented to the wallet search and seizure. *See, e.g.*, *Harajli*, 365 F.3d at 506 (granting the officers summary judgment on a Fourth Amendment claim after finding an individual "actually gave consent" despite the fact that she never explicitly said as much because she "requested that the officers accompany her *to* [(but not inside)] the house" and because she "never objected to the entry of at least one officer into the interior of the house" (emphasis added)); *cf. United States v. Gonzalez-Ruiz*, 794 F.3d 832, 834–36 (7th Cir. 2015) (agreeing that the suspect consented to a search of his car after the suspect answered "I guess" to the officer's request for consent and "did

not object" once the search started); *United States v. Ortiz*, 455 F. App'x 669, 672 (6th Cir. 2012) (affirming the district court's decision finding consent given the individual's cooperative demeanor, he indicated consent with a gesture, and lack of protest when the officers followed him down the hall and into the bedroom); *Price*, 54 F.3d at 346 (considering the suspect's "failure to protest upon learning that [the officer] understood [the suspect's] response as a consent to search" a "crucial fact" in its conclusion that the suspect consented to the search). The Fourth Amendment "does not require [a police officer] to be clairvoyant" after all. *Carter*, 378 F.3d at 588 (alteration in original) (quoting *Robbins v. MacKenzie*, 364 F.2d 45, 49 (1st Cir. 1966)).

Gale's argument on the timing of the wallet removal also fails. Immediately following his explanation that the officers' removal coincided simultaneously with their request, Gale also testified that their removal of the wallet occurred right after he responded "absolutely[.]" (R. 75-6, Gale Dep., PageID 1746 (testifying that Gale "was in the process of saying absolutely not, *and then* they took [the wallet] out of my pocket anyway" (emphasis added)).) But Gale cannot survive summary judgment by providing this court contradictory statements. *E.g.*, *Penny v. United Parcel Serv.*, 128 F.3d 408, 416 (6th Cir. 1997) (finding a doctor's report's "inherently contradictory" statements that plaintiff could not walk one block without rest but could "run[] at a slow pace for [] 15 minutes" incapable of overcoming defendant's summary judgment on plaintiff's disability claim).

Thus, we find no dispute of material facts remains. And the totality of the circumstances show Gale consented to the search and seizure of his wallet. So the district court appropriately granted Defendants summary judgment on this claim.

### 4. Second Frisk & Ride with Paramo

Gale alleges the officers violated his constitutional rights three ways during the second frisk and the ride with Paramo.

First, Gale alleges that he never consented to a ride with Paramo. Based on their interaction, however, Defendants disagree. To support his position, Gale explains that "[the officers'] 'offer'" to give him a ride "does not exist[.]" (Appellant's Br. at 45.) He also expresses that "he was unaware that Paramo was considering giving him a 'ride' (rather than ordering a taxi) until Paramo ordered him 'come on, man' while he was walking toward his vehicle." (*Id.* at 45–46.) And he asserts that "[the officers] repeatedly prevented [Gale] from exercising his right to walk away, even when he expressly said 'no.'" (*Id.* at 46.)

But the record shows Gale indisputably consented to the ride. Contrary to his assertions, Gale *never* said "no" in response to the officers' offer for a ride with them. Instead, Gale only said that in response to their first offer to find him *another* ride. And the officers offered to have Gale ride with them only after Gale could not provide them with a destination address in response to their second offer to find him another ride.

Gale then provided the officers a location where they could drop him off—"3rd on the Rock[.]" (R. 75-11, Video Tr., PageID 1871.) Doing so, Gale implicitly accepted the officers' offer to give him a ride. But Gale didn't stop there. And neither did they. The officers started to ask *again* whether Gale would like them to give him a ride but *before they could finish the question*, Gale responded affirmatively and told them "*yeah*" and expressed his appreciation for the ride. (*Id.* (emphasis added).) Gale then expressed his appreciation for the ride with them *two more times*.

*Only then* did Paramo tell Gale: "Come on." (*Id.*) And right after Paramo did, Gale again explained: "If *you* will take me downtown, I'd appreciate it." (*Id.* (emphasis added).) Gale expressed his appreciation again. He then *thanked* Defendants and immediately walked with Paramo towards Paramo's car. (*Id.*; Ex. C, Paramo's In-Car Video at 22:34–22:38.) So no dispute of material fact exists on whether Gale consented to a ride with Paramo. He did.

Second, Gale asserts he never consented to the second frisk. Defendants again disagree.

There are no disputed material facts over the events surrounding the second frisk.[10] Paramo let Gale know that Paramo had to pat Gale down as a condition of giving Gale a ride. In response, Gale did not refuse. Instead, Gale asked whether he was under arrest. So Paramo answered: "You're not under arrest, dude." (R. 75-11, Video Tr., PageID 1871.) Gale then let Paramo know: "I'm *just asking*." (*Id.* at 1872 (emphasis added).) And again Paramo explained "you're free to go walk on your own." (*Id.*)

Gale argues that Paramo could not receive consent for the second frisk because Paramo never asked for it. But we find distinguishable the only case Gale cites to support his position because that case dealt with officers' seizure of money that claimants removed from their socks. *See United States v. $53,082.00*, 985 F.2d 245, 248 (6th Cir. 1993). It did not involve a situation like the one here—where the officers' actions occurred only after and as a condition of something the individual agreed to enthusiastically. And in the past this court has explained that consent does not require "a per se rule that police must explicitly ask" because "the totality-of-the-circumstances

---

[10] In his deposition, Gale claimed that he "*think*[*s*] Paramo noticed that [Gale] was considering actually walking away[.]" (R. 75-6, Gale Dep., PageID 1749 (emphasis added).) Gale pointed to no verbal or physical indication that communicated an intention to refuse the pat-down or walk away. In fact, Gale never alleged that he even considered walking away. Those assertions do not amount to material facts, only Gale's after-the-fact speculation on his subjective beliefs during the interaction. But "[a] subjective belief of coercion is not sufficient to destroy voluntariness." *McCauley*, 548 F.3d at 446.

standard militates against such a blanket rule." *United States v. Holland*, 522 F. App'x 265, 274 (6th Cir. 2013) (citing *United States v. Montgomery*, 621 F.3d 568, 572 (6th Cir. 2010)).

We instead find *United States v. Lozano*, 916 F.3d 726 (8th Cir. 2019), instructive. The defendants there "accepted [the officer's] offer" to give them a ride. *Id.* at 728. The officer then "advised" the defendants that he "ha[d] to pat them down for his safety" as a condition of the agreed-upon ride. *Id.* Defendants "neither verbally nor nonverbally protested the requested pat-down." *Id.* at 730. So that court concluded the district court erred when it found the officer violated defendants' Fourth Amendment rights. That court instead determined that the "pat-down search was an objectively reasonable measure to protect officer safety." *Id.* And it found defendants "*agreed* to [a] pat-down as a condition of getting a ride in the officer's patrol car." *Id.* (emphasis added).

So too did Gale. Paramo similarly advised Gale about the need for a second pat-down after Paramo consented to the ride in Paramo's car. And "it is not an unreasonable practice for a law enforcement officer to 'conduct a pat-down search before a person enters his police car to protect officer safety.'" *Id.* (quoting *United States v. Espinoza*, 885 F.3d 516, 524 (8th Cir. 2018)). Gale also never verbally or nonverbally protested the requested pat-down, despite verbally responding to the request. And Paramo told Gale in no uncertain terms that Gale could leave. But Gale never showed a desire to walk away from Paramo. He was "just asking" whether he was under arrest. We find the undisputed facts reveal Gale consented to Paramo's objectively reasonable second pat-down.

Last, Gale challenges Paramo's conduct during the ride—specifically that Paramo did not let Gale out immediately after Gale requested to exit Paramo's vehicle. But we find qualified

immunity appropriate here based on a lack of clearly established law. So we do not address whether Paramo's conduct during the ride unconstitutionally deprived Gale of his rights.

Gale argues that qualified immunity cannot shield Paramo from liability because Paramo failed to let Gale immediately out of the car after Gale's request. Gale supports this argument with two reasons: (1) Defendants never invoked qualified immunity for the car ride and (2) "the right to free [sic] from searches and seizures absent a warrant or other exception has long been clearly established and no Defendant is entitled to qualified immunity on any of the search or seizure claims." (Appellant's Br. at 48–49.)

But Defendants did invoke qualified immunity for Paramo's conduct during the ride. And Gale does not meet his burden. *See Simmonds*, 682 F.3d at 444. He identifies no authority to show that Paramo's actions violated clearly established law at the time. In fact, he does not provide *any* legal support for his qualified immunity argument. So we cannot find in Gale's favor and find the district court appropriately awarded Paramo qualified immunity for his actions during the ride.

**B.**

Gale also asks us to reverse the district court's decision granting Defendants summary judgment on his municipal liability claim.

As a threshold matter, Gale must show an alleged constitutional deprivation to succeed on this claim. *City of Canton v. Harris*, 489 U.S. 378, 385 (1989). Gale alleged in his complaint that the City of Royal Oak had a policy or custom of conducting illegal *Terry* stops and frisks. But we find nothing unconstitutional about the *Terry* stop, frisks, and search and seizure of Gale's wallet. So Gale's municipal liability claim fails. Gale presents no other grounds for finding the City has a policy or custom of engaging in unconstitutional activity. Thus, the district court appropriately granted Defendants summary judgment on this claim.

**V.**

The district court appropriately found no dispute of material fact to justify discovery and trial on Gale's claims.  So we AFFIRM.

**BERNICE BOUIE DONALD, Circuit Judge, concurring.** While I concur in the judgment, I write separately to address the constitutional claims Gale raises regarding Paramo's refusal to immediately allow Gale to exit the patrol vehicle upon Gale's request. Though the majority correctly notes that Gale failed to establish that Paramo's actions violated clearly established law, Gale's inability to identify a case specifically addressing the constitutionality of Paramo's actions is not due to his failure to research the issue, but rather due to a lack of case law. Declining to address the constitutionality of an officer's actions simply because there is no clearly established law rendering those actions unconstitutional prevents future plaintiffs in Gale's position from seeking redress for similarly unconstitutional behavior. Providing that analysis in this opinion is an important step in the development of qualified immunity law, and I believe declining to do so in this instance is a mistake.

As the majority opinion explains, the video footage makes it apparent that Gale initially consented to the ride in Paramo's police vehicle. Gale, however, asserts that even if he did initially consent to the ride, Paramo's refusal to allow Gale to exit the vehicle after Gale requested to leave amounts to an illegal seizure. Defendants argue Paramo's decision to drop Gale off approximately 90 seconds after he asked to exit the vehicle does not convert what was otherwise a consensual ride into an unconstitutional seizure. The district court held that Paramo's 90-second delay in dropping Gale off did not violate a clearly established law that would have put Paramo on notice that the failure to pull over immediately and allow Gale to exit the vehicle would violate Gale's constitutional rights.

"In order for a seizure to occur, the encounter must not be consensual and the officers must use physical force or the individual must submit to the officers' show of authority." *United States v. Smith*, 594 F.3d 530, 535 (6th Cir. 2010). "[W]hile a consensual encounter between the police

33

and citizens does not implicate the Fourth Amendment, it may become a seizure when in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Ward*, 756 F. App'x 560, 564 (6th Cir. 2018) (internal quotation marks and citation omitted). However, "even if there is a show of authority and a reasonable person would not feel free to leave, in order for a seizure to occur there must also be submission to the show of authority[.]" *Smith*, 594 F.3d at 536. "[W]hat may amount to submission depends on what a person was doing before the show of authority: a fleeing man is not seized until he is physically overpowered, but one sitting in a chair may submit to authority by not getting up to run away." *Brendlin v. California*, 551 U.S. 249, 262 (2007).

Defendants contend that an objective, reasonable person in this situation, having been reassured at least eight separate times that he was not under arrest, and knowing that the officer was en route to the person's desired destination, would have felt that he was free to leave and had not been "seized." The video footage, however, says otherwise. During the ride, Gale notified Paramo that he was unable to open the door to leave the vehicle, even though he had repeatedly asked to get out of the car. No reasonable person would feel free to leave the vehicle in this situation.

Although this seizure was "unreasonable" in the sense that Gale clearly was not free to leave, we must also determine whether Paramo's conduct violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).

This case presents a unique consideration—if consent to a ride is given at the outset, at what point is it unreasonable for an officer to continue detaining an individual in his vehicle once that consent is withdrawn? Although Defendants contend that 90 seconds is a "reasonable amount of time" to keep Gale detained in the vehicle after he requested to leave, the duration of an officer's interference with an individual's freedom of movement is not determinative as to whether a seizure has occurred, *United States v. Jacobsen*, 466 U.S. 109, 113 n.5 (1984), and "an officer must have a reasonable suspicion of criminal activity to even briefly seize an individual," *Crawford v. Geiger*, 656 F. App'x 190, 204 (6th Cir. 2016). As Paramo repeatedly assured Gale during the ride, he did not suspect Gale of criminal activity. Instead, Paramo explained that he was continuing to hold Gale in the vehicle because Paramo was concerned for Gale's safety due to Gale's intoxication, Gale's unfamiliarity with the area, and Paramo's concern that Gale would cause civil unrest while wandering a neighborhood late at night unable to contact anyone or find his way home. These reasons amount to, at best, a tenuous justification for continuing to seize an individual upon his revocation of consent. While it was reasonable for Paramo to continue driving until he was able to pull over and allow Gale to safely exit the vehicle, Paramo's speculation that Gale's presence in the residential area may cause civil unrest did not justify his continued captivity inside the vehicle. Thus, I believe Paramo's detainment of Gale in the vehicle despite Gale's unequivocal, repeated requests that he be permitted to exit ultimately amounted to an unconstitutional seizure. However, due to the lack of clearly established law rendering those 90 seconds an unlawful seizure in light of Paramo's stated concerns for Gale's safety and Gale's initial consent to the ride, Paramo is entitled to qualified immunity.